UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
|      Plaintiff, | |
|      v. | **Civil Matter No. 4:20-cv-02717** |
| ZAAPPAAZ LLC, also d/b/a Wrist-Band.com, WBpromotion.com, CustomLanyard.net, and WB Promotions; and | |
| AZIM MAKANOJIYA, individually and as an officer of ZAAPPAAZ LLC, | |
|      Defendants. | |

## PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AGAINST ALL DEFENDANTS

i

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................ii

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

I.   DEFENDANTS' AGGRESSIVELY MARKETED PPE DESPITE BEING UNABLE TO FULFILL CUSTOMER DEMAND. ...................................................................... 2

II.  ZAAPPAAZ FAILED TO MAINTAIN ADEQUATE SHIPPING RECORDS.................... 10

III. AZIM MAKANOJIYA CONTROLLED AND PARTICIPATED IN ZAAPPAAZ'S VIOLATIVE SHIPPING AND ADVERTISING PRACTICES.................................................. 11

ARGUMENT ............................................................................................................ 12

I.   THE FTC IS ENTITLED TO SUMMARY JUDGMENT ON ALL COUNTS. ................... 12

    A.   ZAAPPAAZ'S SHIPPING AND REFUND PRACTICES VIOLATED MITOR..... 13

        i.   ZAAPPAAZ LACKED A REASONABLE BASIS FOR ITS QUICK SHIPPING CLAIMS. .................................................................. 13

        ii.  ZAAPPAAZ FAILED TO OFFER REFUNDS OR OBTAIN CONSUMERS' CONSENT FOR DELAYED SHIPMENTS. ............................................ 16

        iii. ZAAPPAAZ FAILED TO DEEM ORDERS CANCELLED AND PROVIDE REFUNDS AS REQUIRED. ...................................................... 17

    B.   ZAAPPAAZ'S DECEPTIVE INVENTORY AND SHIPPING REPRESENTATIONS VIOLATED THE FTC ACT. ......................................................... 18

    C.   AZIM MAKANOJIYA IS INDIVIDUALLY LIABLE FOR ZAAPPAAZ'S VIOLATIONS OF MITOR AND THE FTC ACT. ............................................. 20

II.  THE FTC'S PROPOSED MONETARY AND INJUNCTIVE RELIEF IS APPROPRIATE. 21

    A.   DEFENDANTS MUST REFUND CONSUMERS FOR LATE OR UNSHIPPED ORDERS................................................................................ 22

    B.   THE PROPOSED INJUNCTIVE RELIEF IS NECESSARY TO PROTECT CONSUMERS. ............................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 13

*FTC v. Am. Screening, LLC*, No. 4:20-CV-1021 RLW, 2022 WL 2752750 (E.D. Mo. July 14,

    2022) ....................................................................................................................... 15, 16, 17, 19

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) ...................................................................... 24

*FTC v. DiscountMetalBrokers, Inc.*, No. 2:16–cv–2112–ODW(JC), 2017 WL 4442998 (C.D.

    Cal. Oct. 4, 2017) ................................................................................................................. 14, 24

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) .................................................................................... 23

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993) ................................................................... 23

*FTC v. Five-Star Auto Club, Inc.,* 97 F. Supp. 2d 502 (S.D. N.Y. 2000) ....................................... 25

*FTC v. Hughes*, 710 F. Supp. 1524 (N.D. Tex. 1989) ..................................................................... 13

*FTC v. Kennedy*, 574 F. Supp. 2d 714 (S.D. Tex. 2008) ................................................... 19, 20, 24

*FTC v. Kitco of Nev. Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) ............................................... 21, 24

*FTC v. Lalonde*, 545 F. App'x 825 (11th Cir. 2013) ...................................................................... 24

*FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) ......................................... 18

*FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799 (D. S.D. 2013) ..................................................... 19

*FTC v. Real Wealth, Inc.*, No. 10–0060–CV–W–FJG, 2011 WL 1930401 (W.D. Mo. May 17,

    2011) ................................................................................................................................... 18, 24

*FTC v. Sec. Rare Coin* & *Bullion Corp.*, No. 3–86–1067, 1989 WL 134002 (D. Minn. Sep. 11,

    1989), *aff'd,* 931 F.2d 1312 (8th Cir. 1991) ........................................................................... 24

*FTC v. Sharp,* 782 F. Supp. 1445 (D. Nev. 1991) .......................................................................... 25

*FTC v. SlimAmerica, Inc.,* 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ................................. 25

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)........................................................ 18

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)....................................................... 18

*FTC v. Think Achievement Corp.,* 144 F. Supp. 2d 1013 (N.D. Ind. 2000), *aff'd,* 312 F.3d 259

(7th Cir. 2002)........................................................................................................ 25

*FTC v. Think All Publ'g, LLC*, No. 4:07-cv-011, 2008 WL 687456 (E.D. Tex. March 11, 2008)

............................................................................................................................. 23

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007)...................... 20

*FTC v. US Sales Corp.,* 785 F. Supp. 737 (N.D. Ill. 1992) .......................................... 25

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) ........................................ 24

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ....................................... 18

*In re Telebrands Corp.*, 140 F.T.C. 278 (2005)........................................................... 19

*In re Thompson Med. Co.*, 104 F.T.C. 648 (1984) ...................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).............. 12, 13

*O'Connor v. Smith*, 427 F. App'x 359 (5th Cir. 2011)................................................. 13

*Thompson Medical Co., Inc., v. FTC,* 791 F.2d 189 (D.C. Cir. 1986) ......................... 18

*US v. Commercial Recovery Sys., Inc.*, 179 F. Supp. 3d 728 (E.D. Tex. 2016) ............ 20

*US v. Commercial Recovery Sys., Inc*., No. 4:15–CV–36, 2016 WL 9244671 (E.D. Tex. Apr. 18,

2016) ..................................................................................................................... 25

*US v. Cornerstone Wealth Corp., Inc.*, 549 F. Supp. 2d 811 (N.D. Tex. 2008) ............ 24

**Statutes**

39 U.S.C. § 3009(b) ................................................................................................. 23

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 ............................. 1, 18, 24

Mail, Internet, and Telephone Order Rule ("MITOR"), 16 C.F.R. Part 435 ........................ passim

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) ................................................... 22, 24

Section 19 of the FTC Act, 15 U.S.C. § 57(b) ....................................................... 22, 23

**Rules**

Fed. R. Civ. P. 56 .............................................................................................. 12, 13

## INTRODUCTION

The global COVID-19 pandemic caused a dramatic spike in the demand for personal protective equipment ("PPE"), and therefore, widespread shortages.  To take advantage of this situation, Defendants Zaappaaz LLC ("Zaappaaz") and its founder Azim Makanojiya began aggressively advertising PPE in March 2020 with same-day and rush shipping claims, guaranteed delivery dates, stockpiles of inventory claims, and 100% money back guarantees.  Yet, Defendants failed to ship PPE on an expedited basis—if at all—or by guaranteed delivery dates.  In fact, as soon as they entered the PPE market, Defendants could not fulfill their promises.  Nonetheless, they continued to aggressively advertise PPE and charge consumers upfront for orders they knew they could not fulfill.  When consumers did not receive the promised products—at all, on time, or as ordered—and realized Defendants lied to them, they tried to cancel their orders and get their money back, but Defendants unlawfully refused.

The undisputed facts demonstrate Defendants' PPE-related shipping claims were false in violation of both the Mail, Internet, and Telephone Order Rule ("MITOR"), 16 C.F.R. Part 435, and Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45.  The evidence also uncontrovertibly demonstrates Defendants further violated MITOR when, despite collecting millions of dollars in upfront payments from consumers—many of whom were frontline workers in hospitals and other critical industries—they failed to offer refunds for consumers' untimely and undelivered orders.

## STATEMENT OF FACTS

### I.  DEFENDANTS' AGGRESSIVELY MARKETED PPE DESPITE BEING UNABLE TO FULFILL CUSTOMER DEMAND.

Most of Zaappaaz's consumers purchase products from the company's websites.[1]

Statement of Uncontested Material Facts, ("SOF") ¶ 13.  Prior to the COVID-19

pandemic, Zaappaaz sold promotional products, with a focus on custom lanyards and

silicone wristbands, that drop shipped from their supplier in Asia directly to consumers in

the United States.  *Id.* ¶¶ 12, 27-39.  When the pandemic emerged in 2020, Zaappaaz

refocused its advertising efforts on selling PPE.  *Id.* ¶¶ 15, 95-121.

To do so, at the end of March 2020, Defendants started aggressively advertising

same-day shipping for PPE with guaranteed delivery dates (*e.g.*, next day delivery),

despite knowing of the supply chain and shipping issues caused by the COVID-19

pandemic.[2]  *Id.* ¶¶ 51-58, 75, 77-79, 105-115, 122-130.  Specifically, Zaappaaz made

multiple promises about the immediate availability of PPE.  *Id.* ¶¶ 75, 105-111, 123-130.

For example, Zaappaaz told consumers they could "GET YOUR PERSONAL

PROTECTIVE EQUIPMENT NOW."  Similarly, their wrist-band.com website marketed

PPE with promises such as "GUARANTEED TO SHIP TODAY," "IN STOCK – SHIPS

SAME DAY," "ALL PRODUCTS IN STOCK READY TO SHIP," "ALL PRODUCTS

---

[1] The company does business under the domain names wrist-band.com, WBpromotion.com, and CustomLanyard.net, but the websites are "all the same."  SOF ¶¶ 13-14.  Zaappaaz also sold products through purchase orders allowing for payment on a net 30, 60, or 90 basis.  However, when it started selling PPE, it stopped accepting purchase orders and required upfront payments.  *Id.* ¶ 94.

[2] Even before they started offering PPE, the COVID-19 pandemic affected Defendants' ability to guarantee deliveries of their promotional products.  By February 2020, consumers had started complaining about delays and there were a high number of chargeback disputes due to delayed product delivery.  *Id.* ¶¶ 51-53.  By early March 2020, Defendants started to remove rush shipping options from their website.  Indeed, in early March 2020, Mr. Makanojiya informed the Khans business would be slow for several months because of the pandemic.  *Id.* ¶¶ 54-56.

IN STOCK & SHIP WITHIN 24 HOURS," and "All Goods in Stock Ready to Ship."  *Id.*
¶¶ 106-108.  Zaappaaz also offered consumers "Guaranteed Products Delivered On"
dates.  *Id.* ¶¶ 78-80, 112-115.  Consumers could choose their own delivery dates from a
menu of options, paying more for faster delivery.  *Id.* ¶ 78.

Zaappaaz also guaranteed customers that they would be completely satisfied or
would receive their money back.  *Id.* ¶¶ 117-119.  Defendants' promise took multiple
forms on both their desktop and mobile websites offering "100% Satisfaction,"
"SATISFACTION GUARANTEED," "MONEY BACK GUARANTEED," and a "100%
MONEY GUARANTEE."  *Id.*

Despite offering these extremely attractive shipping options for desperately
needed products, Zaappaaz could not meet its promises; and knew from the very
beginning it could not.  *Id.* ¶¶ 51-59.  First, the company had no inventory.  *Id.* ¶ 131.
Thus, next-day shipping claims had no basis unless they had a supplier who did have
inventory and could ship immediately.  However, at the time, Zaappaaz's Chinese
suppliers faced serious disruptions because of the Pandemic.  *Id.* ¶ 52-53.  Moreover, the
Chinese government also instituted restrictions on the exportation of PPE overseas.  *Id.*
¶¶ 133, 138-139.  Defendants knew of these problems yet continued to make shipping
claims they could not possibly meet.  *Id.* ¶¶ 105-111, 133, 138-139.

Second, COVID-19 delayed the time in which carriers such as FedEx Express,
UPS, and DHL could ship products from China to the United States.  Indeed, on March 3,
2020, FedEx Express suspended its one-time-money-back-guarantee.  *Id.* ¶ 76.  It also
started limiting the amount of PPE that merchants could ship from China to the United

States.  *Id.* ¶ 133.  On April 1, 2020, it announced that due to an increase in demand, there would be daily weight limitations on what customers could ship.  *Id.* ¶ 134.  FedEx Express also restricted shipments to one package per day to an address.  *Id.* ¶ 133. Zaappaaz instantly found out about this restriction because of its daily shipments from China to the United States, yet continued to make its claims.  *Id.* ¶ 141.

Third, COVID-19 impacted the operation of Zaappaaz's call center in India.  The Indian Government shut down the country, which halted operations at the call center.  *Id.* ¶¶ 200-201.  Mr. Makanojiya testified, "things started going down around mid-March" and in mid-April the Indian government "shut down everything," including the call center.  *Id.* ¶ 201.  Zaappaaz relied on its customer service representatives ("CSRs") in India to handle customer inquiries and complaints, which at that point were skyrocketing. *Id.* ¶¶ 189, 191, 194, 207, 210, 275.  For example, in January 2020 Defendants did not receive any customer complaints.  *Id.* ¶ 274.  However, in April 2020 alone they received 820 complaints.  *Id.* ¶ 275.  On April 2, 2020, Fatima Khan[3] told Mr. Makanojiya, "There are back-to-back calls since yesterday and we have limited people even we are taking calls and using maximum resources."  *Id.* ¶ 207.  Even when the call center reopened, employees affected by the pandemic had limited work capabilities.[4]

As a result, Defendants abandoned their drop ship model, opting instead to have products delivered in bulk to their Texas warehouse.  *Id.* ¶¶ 143, 145, 152-154.

---

[3] Ms. Khan, and Eroze Kahn, owned and operated the call center Zaappaaz utilized.  *Id.* ¶¶ 189-191.
[4] While some CSRs could work from home, many CSRs could not because they did not have the necessary equipment including internet connections and computers.  Moreover, CSRs who contracted COVID-19 could not work, and others chose not to work to avoid contracting COVID-19 and transmitting it to family and friends.  *Id.* ¶¶ 146, 203-204, 206.

Defendants started this makeshift fulfillment operation without knowing how to fulfill orders; create shipping labels; or manage, package, and ship inventory. *Id.* ¶¶ 148, 149, 151, 168-174, 177-179, 184. Unsurprisingly, problems arose. *Id.* For example, Defendants' inexperience in packaging goods resulted in damaged goods being delivered to customers, including dispensers and sanitizer. *Id.* ¶¶ 168-171, 184, 224. In fact, the Federal Aviation Administration ("FAA") began investigating Defendants in Spring 2020 because of packaging issues related to hazardous materials and leaking sanitizers. *Id.* ¶ 172. As a result, the FAA required Defendants to obtain the necessary packaging certification. *Id.* ¶ 173. Indeed, on May 31, 2020, Defendants' FedEx agent informed them that their account "has been temporarily suspended for too many failures." *Id.* ¶ 169.

Together, Defendants' lack of inventory, logistical delays, and inexperience prevented them from fulfilling their shipment and delivery promises. *Id.* ¶¶ 133-140, 146, 148-154, 157, 158, 166-167, 184, 187-188. Nonetheless, as orders for PPE continued to come in and Defendants saw sales skyrocket, they continued to aggressively market PPE with rapid delivery claims, constantly monitoring how this advertising optimized sales. *Id.* ¶¶ 105-116, 209, 225.

Defendants' persistent false advertising of product availability and quick shipping times during a period of high demand for fast delivery coupled with Defendants' inept fulfillment efforts, and global shortages resulted in a continuous backlog of delayed orders. *Id.* ¶¶ 158, 213-216, 221, 228, 232, 236, 245, 270-271, 277-280. Indeed, shipping records show that of the 97,967 PPE orders between March and December

2020, 59.5% (58,168 orders) were shipped late or not delivered at all and 63% (61,594 orders) were delivered late or not at all.  *Id.* ¶¶ 461, 468, 472.  In fact, Mr. Makanojiya admitted, "I was aware that the goods were not being shipped on time."  *Id.* ¶ 366(l).

As early as April 19, 2020, Zaappaaz emailed its customers a notice acknowledging PPE shipments were delayed and it lacked inventory.  *Id.* ¶¶ 226-227.  In the notice, Zaappaaz stated:

> Unfortunately, challenges regarding COVID-19 have delayed the entire supply chain industry for shipments coming from China.  New Chinese export restrictions have been implemented this month which are significantly slowing down the shipment of PPE and non-PPE products to the United States and worldwide.  We are working tirelessly with partnering logistical companies and expect to fulfill all orders in the upcoming week.  We are anticipating current restrictions on the total amount of inventory that can be shipped per day will be removed this week.  This will help trickle down our backlog and deliver all remaining PPE orders in queue.  All inventory is in-route.  We are shipping all received inventory the same day to you. . . .We understand we have not been the best communicating or being transparent with you.[5]  *Id.* ¶ 228.

Tellingly, even this acknowledgment did not halt Defendants' false claims. Moreover, Defendants' notice did not provide affected customers with an opportunity to either consent to a revised shipping date or request a refund.[6]  *Id.* ¶¶ 228-229.  Nor did Defendants cancel orders they could not timely fulfill and refund customers their money.  *Id.* ¶¶ 213-216, 221, 246, 248-249, 253-254, 256-263, 277, 307-335.

---

[5] Defendants claim there was a link to this notice on every web page related to a PPE order.  Similarly, they claim that when consumers placed an order, every order page had a delay notice.  However, when the FTC's investigator conducted undercover buys on June 1, 2020, no such notice appeared on Defendants' website.  Moreover, in response to the FTC's document requests, Defendants never produced any evidence supporting their claims that any delay notice appeared on their website.  *Id.* ¶¶ 240-241.

[6] Defendants have not produced any notices offering revised shipping dates or refunds to consumers.  *Id.* ¶¶ 238-239.

On May 3, 2020, Zaappaaz again emailed its customers to acknowledge delays in shipping and a lack of inventory of reusable cloth face masks.  *Id.* ¶ 234-235.  In the notice, Zaappaaz stated:

> [W]e sincerely apologize for any potential miscommunications and delays in delivery.  Although most orders are arriving on time, some customers may face delays regarding orders for cloth face masks.  We are currently facing challenges in receiving imported cloth face masks on time due to logistical covid-19 constraints to meet the significant, unanticipated demand.  However, we anticipate to deliver all cloth face masks orders between May 8 and 15.  *Id.* ¶ 236.

On that same day, Zaappaaz sent customers a nearly identical notice pertaining to surgical gowns.  *Id.* ¶¶ 230-232.  As with their April 19, 2020 notices, none of the Defendants' May 3 notices provided affected customers with an opportunity to either consent to a revised shipping date or, alternatively, to request a refund.  *Id.* ¶¶ 232-237.  Nor did Defendants cancel orders they could not timely fulfill and refund customers their money.  *Id.* ¶¶ 213-216, 221, 246, 248-249, 253-254, 256-263, 277, 307-335.  Again, this acknowledgment did not halt Defendant's shipping promises.

Indeed, conversations CSRs and consumers demonstrate Defendants knew they were not fulfilling their shipping promises.  *Id.* ¶¶ 245, 270, 276-279.  For example, in an April 22, 2020 chat, a CSR told an angry customer "[t]he orders are getting delayed because of CVOID19[.]"  *Id.* ¶ 245.  Zaappaaz did not offer either a refund or cancellation to the consumer.[7]  *Id.* ¶ 245.

---

[7] Defendants sent the same message to its customers in countless communications.

Zaappaaz also kept rush lists noting late deliveries that needed to be addressed as soon as possible. *Id.* ¶ 213. These lists included the names of customers who had not received products on time either because Defendants did not have them,[8] bigger orders had trumped theirs, there were logistical delays, and/or changes in Chinese regulations. *Id.* ¶¶ 133-141, 150-155, 157, 208, 210, 213, 218-219.

Rather than provide customers the option to consent to delayed delivery or cancel and receive a refund as required by MITOR, Defendants engaged in self-help. *Id.* ¶¶ 212, 290-297, 301. Specifically, Defendants "fulfilled" orders with products consumers never ordered. *Id.* For example, at one point, Defendants advertised *liquid* sanitizer when they did not have any, and "fulfilled" these orders by sending *gel* sanitizer without any notice to consumers. *Id.* ¶¶ 212, 264-265. Moreover, Defendants posted random images of products on their website even though those products were not in stock. *Id.* ¶¶ 212, 265. For example, they had no photos of the gel sanitizer they were selling and placed a random stock photo on the website of products they did not sell.[9] *Id.* ¶¶ 212, 265.

Defendants' lies unsurprisingly resulted not only in mounting consumer complaints, but high chargeback rates as well. Specifically, in response to Defendants' dishonest shipping representations, angry, desperate consumers bombarded Defendants with complaints that the products they ordered did not arrive and demanded refunds.[10]

---

[8] The Khans often expressed worry to Mr. Makanojiya about the lack of inventory and complaining customers. *Id.* ¶¶ 208, 210.

[9] In other instances, Zaappaaz simply shipped consumers damaged products. *Id.* ¶¶ 168, 220.

[10] In response to complaints about delayed orders, Defendants' CSRs sometimes offered to refund shipping costs, however, they often failed to actually provide these promised refunds. *Id.* ¶¶ 120-121, 286-287, 289.

*Id.* ¶¶ 215-216, 221, 275, 307-335.  Yet, of the 58,168 late or undelivered orders,

Defendants only issued refunds for 9.6% (5,586 orders).  *Id.* ¶ 470.

Instead of providing prompt refunds, consumer service representatives informed

panicked consumers they could not return products or get their money back.  *Id.* ¶¶ 214-

216, 221, 254-255, 307-335.  Specifically, consumers were told PPE orders were non-

refundable.  *Id.* ¶ 308.  Defendants continued to ship orders after consumers tried to

cancel those orders.  Defendants told consumers their orders had already shipped when

they had not, sent products consumers never ordered, and failed to answer multiple

consumer calls and emails.  *Id.* ¶¶ 146, 158, 213-216, 221, 223, 281-284, 290-301.

Unable to obtain redress from Defendants, many consumers complained to their

credit card companies and requested their money back at such high rates the payment

processors terminated or otherwise suspended Defendants' accounts.  These

consequences included terminations by Amazon[11] and Braintree,[12] locked accounts by

PayPal[13], and frozen funds by Fiserv (aka First Data)[14] and Stripe.[15]  *Id.* ¶¶ 309-335.

---

[11] Amazon shut down Zaappaaz's payment processing account because of high chargebacks.  *Id.* ¶ 335.
[12] By May 2020, Braintree had suspended Zaappaaz's payment processing account because of high chargebacks.  *Id.* ¶ 310.
[13] By the end of May 2020, PayPal had locked Zaappaaz's account because of Zaappaaz's high chargeback rates due in large part to an "increase in non-receipt chargeback claims and disputes."  While PayPal unfroze the account in the end of May 2020, it imposed a limitation on Zaappaaz's maximum processing amount, holding any payment exceeding this cap in reserve for 21 days and releasing it with proof of delivery.  *Id.* ¶¶ 314-318.
[14] In May 2020, Fiserv flagged Zaappaaz for high chargebacks, and by July 2020 it had terminated Zaappaaz as a customer because of high chargebacks.  *Id.* ¶¶ 320-329.
[15] Zaappaaz transitioned to using Stripe as a payment processor in March/April 2020 after Braintree terminated/suspended the company as a customer for high chargebacks.  *Id.* ¶ 332.

## II. **ZAAPPAAZ FAILED TO MAINTAIN ADEQUATE SHIPPING RECORDS.**[16]

Zaappaaz collects and maintains order information including order numbers; order dates; purchased product names; product prices; production days; shipping days; total order cost; promised delivery dates; some refund information,[17] certain complaint information,[18] and order tracking numbers. *Id.* ¶¶ 336, 340-341, 344-345, 376. However, Defendants admit they did not maintain records related to actual shipping dates and delivery dates.[19] *Id.* ¶¶ 340-341. Rather, the only tracking information they maintained was the order tracking number. *Id.* ¶ 340. This failure to properly maintain shipment information affected the company's ability to provide meaningful information to its customers about their orders. *Id.* ¶¶ 349-352. It also resulted in the production of incomplete shipment records to the FTC. *Id.* ¶¶ 340-341, 461-464.

Indeed, in response to the FTC's discovery request for Defendants' shipping records,[20] Zaappaaz had to hire a data specialist to pull order information from Zaappaaz's backend, tracking information from FedEx, UPS, USPS, and DHL websites, and refund information from payment processor platforms into one single master

---

[16] The FTC supplemented Defendant's deficient shipping records with records it subpoenaed from FedEx Express, FedEx Ground, FedEx Freight, DHL, and UPS, and requested from USPIS. *Id.* ¶¶ 394, 399, 432, 451, 453.

[17] Defendants failed to properly maintain refund information. Indeed, Mr. Makanojiya testified that his backend system did not track refunds or chargebacks. *Id.* ¶ 343.

[18] Up until approximately May 2021, Zaappaaz did not maintain complaints submitted via email and webchats. The only complaints Zaappaaz maintained were those submitted by customers through a login to their account provided to them by Zaappaaz through the email confirmation receipt it sent customers. *Id.* ¶¶ 344-348.

[19] In fact, they have not produced any documents at all evidencing procedures to ensure the timely shipment of merchandise. *Id.* ¶355.

[20] In discovery, the FTC requested information showing when Zaappaaz shipped and delivered orders and the date, amount, method, and reason for refunds. *Id.* ¶ 369.

spreadsheet. [21]  *Id.* ¶¶ 371-373.  Zaappaaz ultimately produced a spreadsheet containing

order, shipping, and refund information for the PPE it sold to consumers from March

through December 2020.  *Id.* ¶ 371.  Even this production lacked critical shipment and

delivery information.  *Id.* ¶¶ 376, 462-63.  For example, Defendants did not provide

tracking numbers for 6,051 orders (6.2%).  *Id.* ¶ 462.  Further, for 4,471 orders (4.6%),

they provided a tracking number without shipment or delivery information.  *Id.* ¶ 463.  In

fact, Defendants did not produce any information showing when carriers first picked up

packages from their warehouse.  *Id.* ¶ 376.

## III.  AZIM MAKANOJIYA CONTROLLED AND PARTICIPATED IN ZAAPPAAZ'S VIOLATIVE SHIPPING AND ADVERTISING PRACTICES.

By his own admission, Azim Makanojiya, Zaappaaz's founder, CEO, and

President, is responsible for overseeing and managing the day-to-day affairs and all

aspects of the company's operations.  *Id.* ¶¶ 4-6, 17, 19, 356.  He does not report to

anyone, and he is "the sole person that runs the company here in the States."  *Id.* ¶¶ 16,

357-358.  Mr. Makanojiya led and participated in key aspects of Zaappaaz's shipping,

refund, and advertising practices.  *Id.* ¶¶ 16, 18-19, 26, 54, 193, 207, 212, 218-219, 222,

244, 260, 309-335, 360-366.  He personally solicited PPE sales from customers, drafted

and approved advertisements and policies (including Zaappaaz's website), oversaw

which products to post on the websites, directed inventory purchases, gave guidance on

---

[21] Mr. Makanojiya testified that because Zaappaaz only maintained tracking numbers, it had to attempt to pull out the relevant shipping information from carrier websites.  Its data specialist used Google, carrier websites, and excel formulas to extract and calculate relevant shipping/delivery dates.  *Id.* ¶¶ 373-375.

delivery and shipment of products, received complaints,[22] knew of all the different types of complaints,[23] oversaw responses to customers, directly responded to consumer complaints,[24] decided which customers received refunds, handled chargeback disputes, and addressed any other problems that arose.  *Id.* ¶¶ 16, 18-19, 26, 193, 207, 212, 218-219, 222, 244, 260, 309-335, 360-366.  Moreover, Mr. Makanojiya had knowledge of Zaappaaz's logistical and inventory challenges, substantial backorders,[25] consumer complaints, and advertising.  *Id.* ¶¶ 360-366.

## ARGUMENT

## I.  THE FTC IS ENTITLED TO SUMMARY JUDGMENT ON ALL COUNTS.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  While the moving party bears the initial burden of proving there is no genuine issue of material fact, once satisfied, the burden shifts to the non-moving party to provide evidence that shows there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In order to demonstrate a genuine issue of material fact, the non-moving party must present sufficient evidence for a jury to return a verdict in its favor—"[o]nly disputes over facts

---

[22] Mr. Makanojiya received complaints from the Better Business Bureau, emails from consumers, chargeback disputes, and webchats through Zaappaaz's website.  *Id.* ¶¶ 309-335, 360-365.

[23] Mr. Makanojiya knew consumers complained that: their PPE orders were not being shipped or delivered on time; Defendants did not have the PPE they purchased in stock when they advertised and sold it to consumers; Defendants lied to consumers about orders being enroute and in their advertising about providing same-day shipping; Defendants failed to issue refunds; Defendants delivered broken and incorrect products; and tracking numbers had not been created for orders Defendants should have already shipped or delivered.  *Id.* ¶¶ 360-362, 366.

[24] Mr. Makanojiya spoke with consumers complaining about delayed PPE.  *Id.* ¶ 364.

[25] *Id.* ¶ 158.

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *O'Connor v. Smith*, 427 F. App'x 359, 365 (5th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Evidence that is 'merely colorable' or 'not significantly probative' is insufficient."  *FTC v. Hughes*, 710 F. Supp. 1524, 1525 (N.D. Tex. 1989) (citing *Liberty Lobby*, 477 U.S. at 250).[26]  As set forth below, the undisputed material facts in this case overwhelmingly establish Defendants' liability under both MITOR and Section 5 of the FTC Act.

## A. ZAAPPAAZ'S SHIPPING AND REFUND PRACTICES VIOLATED MITOR.

Defendants violated MITOR in three ways, by:  (1) failing to have a reasonable basis for their advertised shipping claims; (2) refusing to offer consumers, without prior demand, the opportunity to either cancel their orders and receive a refund or consent to a shipping delay in response to late shipments; and (3) declining to deem orders cancelled and to provide prompt refunds when required.

### i. ZAAPPAAZ LACKED A REASONABLE BASIS FOR ITS QUICK SHIPPING CLAIMS.

MITOR prohibits sellers from soliciting any order for the sale of merchandise ordered through the mail, via the internet, or by telephone "unless, at the time of the solicitation, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer" "[w]ithin that time clearly and conspicuously stated in

---

[26] Moreover, "[m]ere questions will not defeat a motion for summary judgment."  *FTC v. Hughes*, 710 F. Supp. at 1528–29 (citing *Matsushita*, 475 U.S. at 587, as standing for the proposition that "once movant for summary judgment has carried its burden under F.R.Civ.P. 56(c), to prevent summary judgment opponent must do more than simply show there is some metaphysical doubt as to movant's right to prevail").

any such solicitation" or "[i]f no time is clearly and conspicuously stated," the seller must have a reasonable basis to expect shipment "within thirty (30) days after receipt of a properly completed order from the buyer."  16 C.F.R. § 435.2(a)(1); *see FTC v. DiscountMetalBrokers, Inc.*, No. 2:16–cv–2112–ODW(JC), 2017 WL 4442998, at *4 (C.D. Cal. Oct. 4, 2017).

As set forth above, Zaappaaz made various express shipping claims in its solicitations, including that products would ship "same day" or within a specific time frame (*e.g.*, next day).  SOF ¶¶ 105-111.  However, from the time Zaappaaz first began selling PPE, it was already aware of the multitude of supply chain issues manufacturers and sellers were facing.  *Id.* ¶¶ 52-56, 132-141.  In fact, Zaappaaz had already altered the shipping policies for its promotional products because of these on-going issues.  *Id.* ¶ 54. Zaappaaz knew that significant supply chain disruptions impacted its ability to receive merchandise from vendors and ship it to customers, including the fact that it could not get inventory out of China in a timely manner, and it did not have sufficient inventory in Texas, nor the expertise or manpower, to make timely shipments.  *Id.* ¶¶ 132-141, 148-154, 157-158, 207, 223.  Under these circumstances, Zaappaaz simply had no basis to represent it would ship consumers' products same day, ship within the promised timeframe, or deliver by guaranteed dates.  *See DiscountMetalBrokers*, 2017 WL 4442998, at *4 (finding defendants' inability to ship on time, if at all, showed they lacked reasonable basis).

Importantly, "[a] seller's failure to maintain 'records or other documentary proof establishing its use of systems and procedures which assure the shipment of merchandise'

14

in accordance with paragraph (a) creates a 'rebuttable presumption that the seller lacked a reasonable basis for any expectation of shipment within said applicable time.'" *FTC v. Am. Screening, LLC*, No. 4:20-CV-1021 RLW, 2022 WL 2752750, at *4 (E.D. Mo. July 14, 2022) (citing 16 C.F.R. § 435.2(a)(4)). Here, as in *American Screening*, the uncontroverted evidence shows Zaappaaz did not maintain such records. Specifically, Defendants admitted that they did not have any records related to shipping and delivery dates, instead maintaining only a tracking number for each shipped order, but never following up to ensure shipment or delivery was on time. SOF ¶ 387. Defendants may claim they had a reasonable basis for their claims because they relied on commitments from their manufacturers and logistics companies and had an eight-year history of shipping successfully with FedEx and UPS. However, such reliance was not reasonable here. Defendants knew the pandemic had already created supply chain interruptions for their traditional products, and consumer complaints began piling up in February 2020. *Id.* ¶¶ 51-53. Moreover, these complaints continued for months, yet Defendants continued their false advertisements rather than changing shipping representations to reflect the realities of their situation. *Id.* ¶¶ 266-308.

In addition, Defendants knew they were not shipping the majority of their PPE orders on time. *Id.* ¶¶ 226-237, 270-271, 277-282, 309-335, 360-366, 468. Their records, supplemented by additional carrier records, show that of the 97,967 PPE orders from March to December 2020, Defendants shipped 58,168 late or there is no evidence they were shipped at all, *i.e.*, 59.5% of Zaappaaz's orders. *Id.* ¶¶ 461, 464, 468. Finally,

Defendants have not produced a single policy or procedure document evidencing the existence of systems to assure the shipment of merchandise.  *Id.* ¶¶ 354-355.

### ii.   ZAAPPAAZ FAILED TO OFFER REFUNDS OR OBTAIN CONSUMERS' CONSENT FOR DELAYED SHIPMENTS.

Because they could not meet their shipping representations, Defendants had two choices under MITOR:  (1) provide refunds without prior demand from customers; or (2) obtain consumers' consent to a later shipment date.  16 C.F.R. § 435.2(b)(1).  They did neither.  Despite discovery requests for all MITOR notices to consumers, Defendants have not produced even one compliant notice.  SOF ¶¶ 238-239.  In fact, Defendants did not communicate with consumers about refunds unless consumers affirmatively complained.  *Id.* ¶¶ 261-262.  Even then, instead of offering refunds, Defendants lied to consumers about the status of their orders, told consumers PPE was non-refundable, informed consumers they could not cancel orders, and stopped responding to calls/emails/chats.  *Id.* ¶¶ 276-289, 308.  Even in the three instances where Zaappaaz notified consumers through mass emails about delays for some products, Defendants never offered refunds or cancellations, and never obtained consumers' permission for new shipping dates.  *Id.* ¶¶ 226-237.

Moreover, "[a] seller's failure to maintain records relating to the refund-or-consent requirement . . .  creates a rebuttable presumption that the seller failed to comply with its requirement."  *Am. Screening*, 2022 WL 2752750, at *6 (citing 16 C.F.R. § 435.2(d)).  Here, as in *American Screening*, the uncontroverted evidence shows Defendants failed to maintain refund records.  SOF ¶ 343.

### iii.   <u>ZAAPPAAZ FAILED TO DEEM ORDERS CANCELLED AND PROVIDE REFUNDS AS REQUIRED.</u>

Under MITOR, a seller who fails to affirmatively provide refunds or obtain consent for delays from consumers must, on its own initiative, cancel the order and provide a prompt refund.  16 C.F.R. § 435.2(c)(5).  Likewise, the seller is required to cancel the order and provide a prompt refund upon the buyer's request for cancellation. *Id.*  Again, Defendants failed to comply with either requirement.  Defendants did not automatically deem orders cancelled, instead, at best, sending notices to its customers apologizing for delays but not offering to cancel orders or provide refunds.  SOF ¶¶ 226-237.  Even worse, Defendants told those consumers that affirmatively contacted them that PPE was non-refundable, and they could not cancel consumers' orders.  *Id.* ¶¶ 254, 308.  Defendants also denied refund requests from consumers with late shipments.  *Id.* ¶¶ 308.

Moreover, again "[a] seller's failure to maintain records relating to the requirements of paragraphs [sic] (c) creates a rebuttable presumption that the seller failed to comply with its requirements."  *Am. Screening*, 2022 WL 2752750, at *6 (citing 16 C.F.R. § 435.2(d)).  Here, as in *American Screening*, Defendants have not offered any evidence of such records.  They have produced no records of affirmatively providing refunds or obtaining consent for delays from consumers.  SOF ¶¶ 242-243, 343.  Rather, the uncontroverted evidence shows a pattern of denying refund requests to consumers. *Id.* ¶¶ 308, 309-335.  Indeed, even Defendants' widely disseminated notices to consumers did not offer refunds or seek consent for delays.  *Id.* ¶¶ 226-237.

17

### B. **ZAAPPAAZ'S DECEPTIVE INVENTORY AND SHIPPING REPRESENTATIONS VIOLATED THE FTC ACT.**

Zaappaaz's conduct not only violated MITOR, but also Section 5 of the FTC Act. Section 5 prohibits deceptive acts and practices in or affecting commerce. *See* 15 U.S.C. § 45(a). An act or practice is deceptive if: "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); s*ee also FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005); *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). A representation that is false is "likely to mislead." *In re Thompson Med. Co.*, 104 F.T.C. 648, 818-19 (1984), *petition for review denied*, 791 F.2d 189, 197 (D.C. Cir. 1986).

Here, Zaappaaz made express representations on both its website and in other communications with consumers that it: (1) would ship goods the same day they were purchased, (2) would deliver goods by guaranteed dates, (3) had multiple items in stock and ready to ship, (4) would refund the full or prorated cost of shipping when orders did not arrive on time, (5) would deliver the goods the consumer ordered, and (6) provided a 100% Money Back Guarantee for its goods. SOF ¶¶ 105-121, 286-287, 289.

Each of these representations was likely to, and in fact did, mislead consumers. A claim is "likely to mislead" if it is false or if the defendant lacked a reasonable basis for asserting the claim at the time it was made. *FTC v. Real Wealth, Inc.*, No. 10–0060–CV–W–FJG, 2011 WL 1930401, at *3 (W.D. Mo. May 17, 2011) (citing *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008)). Zaappaaz's inventory

and shipping claims were false because it did not have the inventory it claimed and did not ship within their promised timeframes.  SOF ¶¶ 150, 366(l).  Moreover, as demonstrated above, Zaappaaz lacked any reasonable basis for its shipping and in stock claims based on its severe inventory and logistical deficiencies.  *Id.* ¶¶ 132-140, 150-154, 200-204.  In addition, Zaappaaz promised consumers on multiple occasions that it would refund shipping costs for orders that were delivered late, but later failed to do so.  *Id.* ¶¶ 120-121, 286-289.  Defendants likewise falsely advertised their 100% Money Back Guarantee—rather than refunding consumers, Defendants told consumers their PPE orders were non-refundable.  *Id.* ¶¶ 307-308.  Furthermore, Defendants routinely shipped products that were not what the consumer ordered or were ultimately inferior or damaged.  *Id.* ¶¶ 290-302; *cf. Am. Screening*, 2022 WL 2752750, at \*5-6 (finding a violation of MITOR where orders were "swapped" without the customer's knowledge or consent).

Finally, Defendants' claims were material.  A misrepresentation is material if it is "likely to affect the consumer's decision to act."  *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008).  First, Defendants' claims are presumed material because they are express.  *FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 816 (D. S.D. 2013).  Second, Defendants' claims are material because they involve central characteristics of the products.  *In re Telebrands Corp*., 140 F.T.C. 278, 292 (2005) (presuming that claims are material if they pertain to, among other attributes, the central characteristics of a product).  Specifically, it is manifest that consumers seeking to purchase scarce PPE during a global pandemic would likely be affected by the shipping and delivery information for such

19

goods, and a torrent of consumer complaints shows they were.  In addition, consumers

expected to receive the specific goods they ordered.  SOF ¶ 301.

### C. AZIM MAKANOJIYA IS INDIVIDUALLY LIABLE FOR ZAAPPAAZ'S VIOLATIONS OF MITOR AND THE FTC ACT.

Individuals are liable for injunctive and monetary relief for corporate violations of

the FTC Act if they participate in unlawful conduct or if they have authority to control

the acts as well as knowledge of them.  *Kennedy*, 574 F. Supp. 2d at 722; *US v.*

*Commercial Recovery Sys., Inc.*, 179 F. Supp. 3d 728, 736 (E.D. Tex. 2016).  There is no

dispute that Mr. Makanojiya controlled and participated in Zaappaaz's unlawful conduct.

SOF ¶¶ 16, 18-19, 26, 54, 193, 212, 218-219, 222, 244, 260, 309-335, 356-358, 360-366.

An individual's status as a corporate officer can create a presumption of authority

to control that is difficult to rebut.  *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d

1247, 1270 (S.D. Fla. 2007).  Here, Mr. Makanojiya testified that he founded Zaappaaz,

is currently the CEO of the company, and manages and controls it.  SOF ¶¶ 4-7, 356.  By

Mr. Makanojiya's own admission, he has "been the sole person that runs the company

here in the States," and any employees report to him.  *Id.* ¶¶ 16, 357-358.

Mr. Makanojiya also participated directly in the acts at issue.  As discussed above,

Mr. Makanojiya personally solicited PPE sales from consumers and directed key aspects

of Zaappaaz's shipping, refund, and advertising policies.  *Id.* ¶¶ 16, 18-19, 26, 54, 193,

212, 218-219, 222, 244, 260, 309-335, 361-366.  For example, he drafted and approved

advertisements and policies, chose what products to sell, directed inventory purchases,

directed employees on how to deal with complaints from consumers and which

20

consumers should receive refunds, and was responsible for addressing miscellaneous problems that arose. *Id.* ¶¶ 16, 18-19, 26, 54, 193, 212, 218-219, 222, 244, 260, 309-335, 361-366.

Likewise, there is no question that Mr. Makanojiya had knowledge of Zaappaaz's unlawful practices. Although knowledge may be established by showing reckless indifference to the truth, here, he had actual knowledge of the MITOR violations and deception. *See FTC v. Kitco of Nev. Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985). Mr. Makanojiya was involved in all aspects of the business and had direct knowledge of its ongoing issues. SOF ¶¶ 16, 18-19, 26, 54, 193, 212, 218-219, 222, 244, 260, 309-335, 361-366. He personally received complaints from consumers and directly responded to them, communicated with payment processors regarding alarming numbers of chargeback disputes, decided which consumers would receive refunds, and decided what advertisements to use and what products to post on the website, all while dealing with a lack of inventory and logistical issues he was trying to solve. *Id.* ¶¶ 63, 95-104, 131-141, 260, 309-335, 364. Rather than making inventory and delay issues clear on the website and preventing consumers from placing orders and making payments to his company, Mr. Makanojiya chose to deceive consumers by falsely claiming they had inventory in stock and would deliver in a specific number of days. *Id.* ¶¶ 95-116.

## II. THE FTC'S PROPOSED MONETARY AND INJUNCTIVE RELIEF IS APPROPRIATE.

Under Section 19 of the FTC Act, when a party "violates any rule under [the FTC Act] respecting unfair or deceptive acts or practices," the Court may grant "such relief as

the court finds necessary to redress injury to consumers or other persons, partnerships,

and corporations resulting from [Defendants'] rule violation."  15 U.S.C. § 57b(a), (b).

"Such relief may include . . . the refund of money."  15 U.S.C. § 57b(b).  Moreover,

Section 13(b) of the FTC Act provides the FTC may obtain permanent injunctions for

violations of "any provision of law enforced by the [FTC]."  15 U.S.C. § 53(b).  The

FTC's proposed order, which includes monetary relief to refund consumers injured by

Defendants' MITOR violations, and injunctive relief to preclude future FTC Act

violations, is both appropriate and necessary.

### A. DEFENDANTS MUST REFUND CONSUMERS FOR LATE OR UNSHIPPED ORDERS.

Defendants violated just such a rule—MITOR.  Specifically, MITOR required

Defendants, in response to their late shipments, to offer consumers "an option either to

consent to a delay in shipping or to cancel the . . . order and receive a prompt refund."  16

C.F.R. § 435.2(b)(1).  Defendants did not provide this option to consumers.  SOF ¶¶ 226-

239, 309-335.  Because Defendants failed to give consumers this option, MITOR

required them to cancel orders and make a "prompt refund."  16 C.F.R. § 435.2(c)(5).

Defendants admittedly failed this requirement as well.  Worse yet, Defendants either

ignored consumers' affirmative requests for refunds, or lied to them claiming they had no

right to a refund.  SOF ¶¶ 307, 308.

To demonstrate the consumer injury caused by Defendants' MITOR violations,

the FTC must show "that its calculations reasonably approximated the amount of

customers' net losses, and then the burden shifts to the defendants to show that those

figures were inaccurate." *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).  The risk of any uncertainty falls on "the wrongdoer whose illegal conduct created the uncertainty." *Id.*  Here, Defendants failed to ship most PPE orders on time, if at all.  SOF ⁋ 468.  Defendants have not offered a single instance in which they properly offered a consumer an option to consent to a delay in shipping or to cancel the order for a prompt refund.  *Id.* ⁋⁋ 238-239, 242-243.  Moreover, they routinely denied refunds to those consumers who asked for them.  *Id.* ⁋⁋ 307-335.  Therefore, judgment in the amount of the refunds that Defendants should have provided, but did not, is the appropriate remedy.  *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606-07 (9th Cir. 1993) (holding that full refunds were appropriate measure of consumer harm in Section 19 case because defendants' widespread misrepresentations tainted consumers purchasing decisions); *see also FTC v. Think All Publ'g, LLC*, No. 4:07-cv-011, 2008 WL 687456, at *2 (E.D. Tex. March 11, 2008) (finding "it is the defendant's fraud, 'not the value of the thing sold,' that creates a need for restitution).[27]  Based on Defendants' own—albeit incomplete—records, this amount is at least $37,549,472.14.[28]  SOF ⁋ 480; *see Febre*, 128 F.3d at 535.

---

[27] That some consumers eventually received some product does not mitigate the harm that they suffered. Even where consumers eventually received what they ordered, the law does not permit Defendants to choose their own remedy for their violative practices.  Rather, under MITOR, consumers' orders were deemed cancelled when Defendants failed to offer them the opportunity to consent to or cancel a delayed shipment.  16 C.F.R. § 435.2(c)(5). The fact that Defendants nevertheless chose to send the products months later makes them unordered merchandise which, as a matter of law, consumers may treat as a gift, which they have no obligation to return.  *See* 39 U.S.C. § 3009(b) ("Any merchandise mailed in violation of subsection (a) of this section [without authorization] . . . may be treated as a gift by the recipient, who shall have the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender."); *see also Figgie*, 994 F.2d at 606-07 (rejecting giving sellers credit for the value of the product consumers received because the "fraud [is] in the selling").

[28] As set forth in the respective Declarations of Rufus L.M. Jenkins and Elizabeth Anne Miles, this calculation is based on Defendants' own records.  Specifically, it is the total of all revenue Defendants received from late or unshipped PPE orders from March to December 2020, minus any refunds or chargebacks issued for those orders.  SOF ⁋⁋ 367-368, 461-470, 474-480.

23

## B. **THE PROPOSED INJUNCTIVE RELIEF IS NECESSARY TO PROTECT CONSUMERS.**

A permanent injunction is also necessary to protect consumers because Defendants clearly violated MITOR as well as the FTC Act and there is a cognizable risk of future violations.  Under such circumstances, Section 13(b) of the FTC Act authorizes courts to issue permanent injunctions.  *Kennedy*, 574 F. Supp. 2d at 719, 724; *US v. Cornerstone Wealth Corp., Inc.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008); *FTC v. Sec. Rare Coin & Bullion Corp.*, No. 3–86–1067, 1989 WL 134002, at *19 (D. Minn. Sep. 11, 1989), *aff'd*, 931 F.2d 1312 (8th Cir. 1991); *Kitco*, 612 F. Supp. at 1296; *see also FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011).  Because Defendants violated these regulations, they "must expect some fencing in."  *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (citation omitted).  Here, the proposed injunctive relief enjoins defendants from advertising or selling protective goods and services because Defendants acted egregiously, taking advantage of consumers' panic during the pandemic to vigorously advertise PPE products as "IN STOCK" and "GUARANTEED TO SHIP TODAY" and offered guaranteed delivery dates, despite Defendants' knowledge of serious limitations on the shipment of goods during this time.[29]  SOF ¶¶ 52-56, 105-116, 132-142, 146-158, 277-282, 307, 366(l).  After making these representations, Defendants required customers to pay upfront for their orders, and then took months to ship PPE, if it was ever shipped at all.  *Id.* ¶¶ 94, 468.  Defendants' violations were systemic, and

---

[29] Numerous courts have entered bans against defendants in cases involving Section 13(b) of the FTC Act. *See, e.g.*, *FTC v. Lalonde*, 545 F. App'x 825, 841-42 (11th Cir. 2013); *DiscountMetalBrokers*, 2017 WL 4442998, at *6; *Real Wealth*, 2011 WL 1930401, at *4; *Sec. Rare Coin & Bullion Corp.*, 1989 WL 134002, at *17-19; *Kitco*, 612 F. Supp. at 1298; *Kennedy*, 574 F. Supp. 2d at 724; *Cornerstone Wealth Corp.*, 549 F. Supp. 2d at 820-21.

importantly, continued well beyond notice of the FTC's lawsuit.  *Id.* ¶¶ 116, 262.

Therefore, injunctive relief is particularly warranted here.  Because of this egregious

conduct, and the fact that Defendants' illegal practices lend themselves well to the sale of

their non-PPE products (*e.g.*, promotional products), the proposed injunctive relief also

ensures Defendants will adhere to MITOR's requirements, maintain proper shipping and

refund records, and not mislead consumers about shipping/delivery times, refund

policies, and the nature of the product they ordered.

The FTC's proposed order also includes compliance monitoring measures that are

common in FTC matters.  These provisions are narrowly tailored to help ensure

Defendants' compliance with the requested permanent injunction.  *See US v. Commercial*

*Recovery Sys., Inc*., No. 4:15–CV–36, 2016 WL 9244671 (E.D. Tex. Apr. 18, 2016); *FTC*

*v. Think Achievement Corp.,* 144 F. Supp. 2d 1013, 1018 (N.D. Ind. 2000), *aff'd,* 312

F.3d 259 (7th Cir. 2002); *FTC v. Five-Star Auto Club, Inc.,* 97 F. Supp. 2d 502, 533 (S.D.

N.Y. 2000); *FTC v. SlimAmerica, Inc.,* 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999); *FTC*

*v. US Sales Corp.,* 785 F. Supp. 737, 753-54 (N.D. Ill. 1992); *FTC v. Sharp,* 782 F. Supp.

1445, 1456-57 (D. Nev. 1991).  These provisions are necessary to allow the Commission

to effectively monitor Defendants' business activities and take appropriate enforcement

action in the future, if necessary.  Accordingly, the Commission respectfully requests that

the Court enter the proposed permanent injunction submitted in its proposed order.

Respectfully Submitted,

Dated:     October 26, 2022      /s/ Michelle Schaefer
                                              Michelle Schaefer, Attorney-in-Charge
                                              D.C. Bar # 478443
                                              S.D. Texas (admitted *Pro Hac Vice*)
                                              Anne Collesano
                                              D.C. Bar # 1029665
                                              S.D. Texas (admitted *Pro Hac Vice*)
                                              600 Pennsylvania Avenue, NW, CC-9528
                                              Washington, DC 20580
                                              (202) 326-3515; mschaefer@ftc.gov
                                              (202) 326-2485; acollesano@ftc.gov

                                              Attorneys for Plaintiff
                                              FEDERAL TRADE COMMISSION

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 26, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF and served on users registered to receive electronic notice in the captioned cases via transmission of Notices of Electronic Filing generated by CM/ECF.  Native exhibit files unsuitable for PDF filing were transmitted via secure file link to counsel listed below and the Court.

**Butch Boyd Law Firm**

Ernest W. Boyd (Lead Attorney)
State Bar No. 00783694
butchboyd@butchboydlawfirm.com

Jeremy R. Stone (Of Counsel)
State Bar No. 24013577
jeremystone@butchboydlawfirm.com

Michael J. Blanchard (Of Counsel)
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com

2905 Sackett Street
Houston, TX 77098
713-589-8477 (Phone)
713-589-8563 (Fax)

Attorneys for Defendants

Dated:  _____October 26, 2022_____        /s Michelle Schaefer_____
                                                                        Michelle Schaefer, Attorney-in-Charge