## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | § § § | |
| **VS.** | § | **Civil Action No. 4:20-CV-2717** |
| | § § § | |
| **ZAAPPAAZ, LLC, ET AL.** | § | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, MOTION FOR LEAVE TO EXTEND DEADLINE FOR RESPONSE, AND MOTION TO EXCLUDE THE TESTIMONY OF RUFUS JENKINS

Defendants file this Response and respectfully shows as follows:

### I.    Adoption by Reference

1.    Defendants adopt by reference the arguments made in their Motion for Summary Judgment (ECF No. 101) as additional grounds to deny Plaintiff's Motion.

### II.    Facts are Contested

2.    The FTC titled its Statement of Facts as "uncontested." Such a title implies the FTC conferred with Defendants regarding those facts. The FTC did not do so, and Defendants contest many of the FTC's "facts."

1

### III.   Summary Judgment Evidence

Defendants rely on the following unfiled discovery products and other evidence:

| No. | Bates Range / Description |
|-----|--------------------------|
| DX 1 | Azim Makanojiya Dep. (August 11, 2021) |
| DX 2 | Azim Makanojiya Dep. (August 12, 2021) |
| DX 3 | Azim Makanojiya Dep. (December 14, 2021) |
| DX 4 | Azim Makanojiya Dep. (February 3, 2022) |
| DX 5 | Deposition of FedEx Ground / David Muse |
| DX 6 | Deposition of FedEx Corporation / Tracy Chapell |
| DX 7 | Deposition of Rufus Jenkins |
| DX 8 | Deposition of FedEx Freight / Floyd Smith |
| DX 9 | Deposition of Rosemary Coates |
| DX 10 | Plaintiff's Initial Disclosures |
| DX 11 | Plaintiff's First Supplemental Disclosures |
| DX 12 | Plaintiff's Second Supplemental Disclosures |
| DX 13 | Plaintiff's Third Supplemental Disclosures |
| DX 14 | Declaration of Michael J. Blanchard |
| DX 15 | FTC Commissioners' Majority Statement |

## IV.    Summary Judgment Facts

3.    Before the pandemic, Zaappaaz sold promotional items (wristbands, lanyards, and similar items) on its website. *See* DX 1 at 71:12-15; 82:7-9.

4.    Zaappaaz sourced 90% of its promotional items from Chandler Liu. *Id.* at 72:12-16.

5.    Zaappaaz relied on Mr. Liu to process Zaappaaz' pre-pandemic orders. *Id.* at 73:3-8.

6.    Ninety-nine percent of the time, Mr. Liu's China team would package and ship the promotional items. *Id.* at 75:3-6.

7.    Once Mr. Liu shipped, his software would send the tracking number back to Zaappaaz' custom built back-end system. *Id.* at 83:2-12; 84:7-19.

8.    Zaappaaz neither had nor has any insight into how Mr. Chandler operated his business. *See id.* at 75:12-20; 76:2-10. Zaappaaz does not know, for example, what, if any, software Mr. Liu uses to handle the order fulfillment process. *Id.*

9.    Mr. Liu had an oral contract with Zaappaaz to provide as

3

much PPE as Zaappaaz needed. DX 2 at 483:10-23.

10.     Once Zaappaaz noticed logistics problems, Zaappaaz changed its business model from overseas shipping to domestic shipping. DX 1 at 58:6-14.

11.     Zaappaaz' principal had never heard of the Mail, Internet, and Telephone Order Rule ("MITOR") before the FTC filed this lawsuit. *Id.* at 100:5-12.

12.     Zaappaaz guaranteed delivery dates for its products, not shipping dates. *Id.* at 104:3-13.

13.     Zaappaaz began selling personal protective equipment ("PPE") in the middle of March 2020. *Id.* at 109:10-13.

14.     Zaappaaz started selling PPE after the City of Houston reached out to Mr. Makanojiya and Mr. Makanojiya provided the city some masks. *Id.* at 109:19-24.

15.     When Zaappaaz started selling PPE, it was able to timely fulfill orders directly from China. *Id.* at 110:12-16.

16.     Zaappaaz started shipping from Texas at the end of March or start of April 2020. *Id.* at 118:2-5.

17.     Zaappaaz started shipping from Texas because: (a) shipper

hubs became congested, *id.* at 118:24 to 119:1; (b) Chinese regulations changed overnight by, for example, halting PPE shipments to the U.S. and sending products back to the shippers, *id.* at 119:4-11; and (c) China disallowed shipping direct to consumer from China for small orders, *id.* at 119:12-23.

18.   In addition, shippers like FedEx implemented new rules overnight to reduce allowed shipping weight from thousands of kilos to tens of kilos. *Id.* at 120:8-16. FedEx also limited shipping to one package per day to a particular address. *Id.* at 120:17-19.

19.   Zaappaaz tried to work around FedEx's new requirements by shipping to friends and family. *Id.* at 120:19-24.

20.   To be clear, there were instances where FedEx would take custody of a package and then send the shipment back to the shipper to "restamp" the package. *Id.* at 122:17 to 123:8.

21.   Once Zaappaaz started shipping from Texas, it ran 24-hour shifts at the warehouse. *Id.* at 123:13-16.

22.   Zaappaaz could not, however, control shippers like FedEx. *Id.* at 123:16-19.

23.   Zaappaaz could also not control customs blockages in China.

*Id.* at 123:21-24.

24.     In other words, Zaappaaz timely put PPE into the hands of shippers, but orders were still delayed for reasons beyond Zaappaaz' control. *Id.* at 124:5-9.

25.     Zaappaaz had ample personnel to pack PPE and put orders into shippers' hands. *See id.* at 124:13-20.

26.     Zaappaaz had a trailer outside its warehouse, and Zaappaaz would pack the trailer (thus placing product into FedEx' hands). *See id.* at 124:21 to 125:2.

27.     Sometimes FedEx would fail to timely pick up the trailer. DX 2 at 422:25 to 423:17.

28.     Zaappaaz never advertised a product as in stock that was not in stock. *Id.* at 125:16 to 127:3.

29.     Zaappaaz described "packing" as placing a package into the hands of a shipper and "shipping" as the shipper leaving *with* the packaged product. *See id.* at 128:17-21.

30.     The pandemic affected Zaappaaz' ability to deliver on time because of shipper delays, *id.* at 129:1-12, import/export limitations, *id.* at 149:14-21, and not because of Zaappaaz personnel problems or

6

inventory problems, *id.* at 124:13-20; 125:16 to 127:3.

31.    Likewise, shipper delays, and not Zaappaaz delays, impacted shipments from China. *Id.* at 129:13-18.

32.    With respect to promotional items, the pandemic did not impact Zaappaaz' operations until March of 2020. *Id.* at 132:17-24; 148:8-24.

33.    Zaappaaz placed a banner on its website notifying all customers that there were delivery delays caused by COVID-19. *Id.* at 139:9-20; 142:5-9.

34.    Zaappaaz outsourced customer service responsibility to a group in India. *Id.* at 161:5. When Zaappaaz realized customer service representatives ("CSRs") relayed incorrect information to consumers, Mr. Makanojiya provided his personal cell phone number to disgruntled customers. *Id.* at 161:5-17.

35.    Zaappaaz' policy was to issue a refund when a consumer called and asked for a refund because the product had not been delivered timely. *Id.* at 167:20-25. This was also the instruction given to CSRs. *Id.* at 168:6-10.

36.    Zaappaaz instructed CSRs to initiate a refund to any

customer that wanted a refund, and to any customer that received a product that the consumer did not want. *Id.* at 169:7-24.

37. If a product had left Zaappaaz' hands and a consumer wanted a refund, Zaappaaz' policy was to send the consumer a return label and process a refund on receipt of the returned goods. *Id.* at 170:5-14.

38. Certain CSRs misrepresented Zaappaaz' policy due to lack of training by Zaappaaz' vendor. *Id.* at 172:8-15.

39. Zaappaaz had a reasonable basis to make same-day shipping claims on PPE products, because (a) Zaappaaz knew the products were in stock in either its China or Texas warehouses and (b) it had experienced an eight-year history of shippers delivering Chinese products on time. *Id.* at 174:22 to 175:8.

40. About three or four weeks after Zaappaaz started shipping from Texas, certain delivery restrictions were lifted and Zaappaaz was able to ship all products directly to its Texas warehouse. *Id.* at 180:19 to 181:17.

41. When Zaappaaz saw that shipping PPE in volume was an issue, it chartered jets to fly product from China to the U.S. DX 2 at 358:14 to 359:22.

42.     Zaappaaz contracted with American personnel to handle customer service calls when customer service representatives ("CSRs") in India could not operate because of the pandemic. *See* DX 1 at 68:6-22.

43.     Logistics is the process between the end of manufacturing and delivery to the customer. DX 9 at 194:13-18.

44.     Defendants' expert, Rosemary Coates, has 35 years of pervasive logistics experience. *Id.* at 195:3-8. Her undergraduate degree is in business and logistics management. *Id.* at 195:12-16.

45.     In her 35-year career, Ms. Coates had never seen an event impact logistics the way COVID-19 did. *See id.* at 195:17-21. The pandemic was a "black swan event" that might occur once in a lifetime. *Id.* at 195:23-25.

46.     Before the pandemic, 50% of worldwide freight moved on passenger aircraft. *Id.* at 199:14 to 200:1. Once passenger flight frequency declined dramatically, the airplane belly cargo space was unavailable, imposing significant additional burdens on shipping companies. *Id.*at 199:25 to 200:1.

47.     Thus, FedEx was unable to timely deliver items timely put in FedEx's hands. *Id.* at 200:11-20.

9

48.     While there was plenty of PPE available in China, shippers had a difficult time making on-time deliveries. *Id.* at 210:3-12.

## V.     Motion to Exclude Testimony of Rufus Jenkins and Ann Miles

### A.     The FTC never disclosed Jenkins and Miles as experts.

49.     The FTC never designated Rufus Jenkins or Ann Miles as experts in this case. *See* DX 10-13 (Plaintiff's Initial, First Supplemental, Second Supplemental, and Third Supplemental Disclosures). Instead, the FTC disclosed them as fact witnesses. *See id.* Plaintiff thus attempts to elicit opinion testimony from Mr. Jenkins and Ms. Miles under Fed. R. Evid. 701 and not Rule 702.

### B.     Jenkins relied on non-primary sources to form his opinions.

50.     Because, however, Mr. Jenkins relied on outside sources beyond his personal knowledge developed from primary sources, he must be qualified and disclosed under Rule 702. *See James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011). The Court must therefore exclude Mr. Jenkin's expert testimony because the FTC failed to disclose Mr. Jenkins as an expert.

51.     The FTC may only elicit lay opinion testimony based on Mr.

10

Jenkins' first-hand knowledge or observations. *See DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685 (5th Cir. 2003). The FTC wishes to elicit testimony from Mr. Jenkins to "help calculate injury in this case." DX 7 at 158:14-16. Mr. Jenkins admits he will testify "as to the amount of economic injury that consumers suffered in this case." *Id.* at 109:2-5.

52.    To determine the amount of economic injury, Mr. Jenkins relied on the work of another FTC employee, Ann Miles. *Id.* at 57:18 to 59:5. Among other items, Mr. Jenkins relied on a spreadsheet Ms. Miles prepared that purported to show what products were delivered on time, late, and not at all. *Id.* at 58:12-22. Mr. Jenkins also relied on Ms. Miles' work in determining when orders were shipped and delivered. *Id.* at 23:2-6. Mr. Jenkins admits Ms. Miles added her own work product to existing spreadsheets produced by the Defendants. *Id.* at 49:12 to 50:8. Ms. Miles added sheets or tabs to existing spreadsheets. *Id.* Because she added her own work product to existing spreadsheets, Ms. Miles should have been disclosed as an expert. Because she was not, the Court must exclude any evidence she created or testimony she offers.

53.    At his deposition, Mr. Jenkins had trouble answering the basic question of how he knew whether a given order was delivered or

11

undelivered. *Id.* at 57:8 to 59:5. He was not even able to say under oath whether FTC attorneys altered the spreadsheet upon which he relied. *Id.* at 59:3-5.

54.    Mr. Jenkins' opinions are thus *not* based on his own independent knowledge or observations. As such, he must be qualified and disclosed as a Rule 702 expert witness. *See. DIJO, Inc.* at 685. The FTC did not properly qualify or disclose Mr. Jenkins, and it would be an abuse of discretion to admit his testimony. *See id.*

### C.    Jenkins' opinions are unreliable and unfounded.

55.    Beyond inadequate disclosure under Rule 26, Mr. Jenkins is unqualified, and his opinions are unreliable. Mr. Jenkins admits there is a distinction between net revenue and consumer injury, *id.* at 117:6-9, but he did nothing to determine if there was such a difference in this case. *See generally* DX 7. He crafted his opinions based on instructions from FTC attorneys. *See id.* at 24:18-20; 28:11-22.

56.    While Mr. Jenkins admitted he would testify about consumer injury, the FTC's counsel instructed Mr. Jenkins not to reveal whether he had been given a definition of "consumer injury." *Id.* at 42:22 to 43:13. Opposing counsel claimed the answer would violate the FTC's work

product privilege. *Id.* at 43:9-13. Because the FTC prohibited inquiry into Mr. Jenkins' underlying data, his opinions are demonstrably unreliable. *See* FED. R. EVID. 702.

### D.   Miles created work product that is not part of the summary judgment record.

57.   Ms. Miles manipulated the data Zaappaaz produced as ZAAPPAAZ_0020596 (attached to the FTC's Motion as PTX 57). PTX 57, however, does not include any of the data referenced by Ms. Miles or Ms. Jenkins in their Declarations (PTX 99, Miles; and PTX 100, Jenkins). As such, there is no admissible summary judgment evidence showing any damages.

## VI.   Response to Plaintiff's Motion for Summary Judgment

### A.   The FTC misrepresents the facts.

58.   Plaintiff makes specious representations and arguments in its Motion. For example, paragraph 131 of the FTC's Statement of Facts ("SOF") (ECF No. 100 ¶ 131), states in whole as follows:

> 131.   When Defendants began selling PPE in March 2020, Zaappaaz was still shipping PPE to customers directly from China, and not from its Texas warehouse.  It shipped PPE from China up until the end of March 2020.  PX 22 at 117:12-118:1.

59.   Citing to that paragraph, the FTC states in its Motion that

Zaappaaz "had no inventory":

> Despite offering these extremely attractive shipping options for desperately needed products, Zaappaaz could not meet its promises; and knew from the very beginning it could not. *Id.* ¶¶ 51-59. First, the company had no inventory. *Id.* ¶ 131.

ECF No. 99 at p. 3.

60.    The Motion excerpt thus misrepresents paragraph 131 of the SOF (ECF No. 100 ¶ 131). When it started selling PPE, Zaappaaz had inventory in China. DX 1 at 110:12-16. Zaappaaz thus had a reasonable basis to claim it had a supplier who had inventory and could ship immediately. *See id.*

61.    Next, the FTC misleads the Court by citing evidence regarding *non-PPE* suppliers to support the proposition that PPE suppliers faced "serious disruptions." ECF No. 99 p. 3:

> inventory and could ship immediately. However, at the time, Zaappaaz's Chinese suppliers faced serious disruptions because of the Pandemic. *Id.* ¶ 52-53. Moreover, the

62.    Had the FTC extended its citation to paragraph 54, it would be clear that the referenced suppliers supplied promotional items like wristbands and lanyards, and not PPE.

63.    In fact, PPE inventory was not an issue. Deliveries were

14

delayed because of shipper delays, import/export limitations, and not because of Zaappaaz personnel or inventory problems. *Supra* ¶¶ 28-29. To help solve the logistics problems, Zaappaaz chartered FedEx planes to bring PPE from China to the U.S. *Supra* ¶ 39.

64.    Finally, the FTC claims Zaappaaz received "thousands" of complaints when its own SOF identifies only 1,396 orders with complaints out of over 95,000 orders. ECF No. 100 ¶ 268 (1,396 orders with complaints); *id.* at ¶ 461 (97,967 PPE orders from March 2020 to December 2020).

### B.    Summary judgment is inappropriate in a complex case like the one at bar.

65.    Summary judgment is inappropriate in cases where the issues involve intent. *See Middleton v. Reynolds Metals Co.*, 963 F.2d 881, 882 (6th Cir. 1992). Summary judgment is inappropriate when a trial court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions. *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 413 (5th Cir. 1980). The summary judgment evidence in this case is so voluminous the FTC could not even properly serve or file the evidence. *See* ECF No. 101-102. Azim Makanojiya's deposition transcripts alone

exceed 800 pages representing more than 25 hours of time.

66.   Under Fifth Circuit precedent, just resolution of this case requires a trial; the Court should not decide the case in summary fashion. *See Keiser*, 614 F.2d at 413.

### C.   The FTC promulgated MITOR under an unconstitutional delegation of congressional power.

67.   In *West Virginia v. EPA*, the Supreme Court applied the major questions doctrine to strike down an EPA regulation. 142 S.Ct. 2587 (2022). When Congress vests an agency with authority, federal courts must decide whether "Congress in fact meant to confer the power the agency has asserted." *Id.* at 2608. Courts "have reason to hesitate" before finding that Congress "meant to confer such authority" when an agency asserts authority over matters of economic and political significance. *Id.*

68.   The FDA, for example, once claimed it had authority to regulate and ban tobacco products. *Id.* (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 126-127 (2000)). The CDC, under authority to adopt measures "necessary to prevent the … spread of disease," could *not* ban evictions nationwide. *Id.* In *Util. Air Regulatory Group v. EPA*, the Supreme Court blocked the EPA from construing the

16

term "air pollutant" to include "greenhouse gases." *Id.* In *Gonzales v. Oregon*, the U.S. Attorney general tried to revoke physicians' licenses whenever it thought to do so consistent "with the public interest." *Id.* (citing 546 U.S. 243 (2006)).

69.   Common to the examples above is a federal agency's attempt to exercise regulatory power over "a significant portion of the American economy" without a clear congressional mandate. *See id.* To summarize, an agency "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 142 S.Ct. at 2609.

70.   The FTC's asserted authorization to promulgate MITOR is found at 15 U.S.C. § 57a(a)(1)(B):

---

### § 57a. Unfair or deceptive acts or practices rulemaking proceedings

**(a) Authority of Commission to prescribe rules and general statements of policy.**

   **(1)** Except as provided in subsection (h), the Commission may prescribe—

   **(A)** interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 5(a)(1) of this Act [15 USCS § 45(a)(1)]), and

   **(B)** rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of such section 5(a)(1) [15 USCS § 45(a)(1)]), except that the Commission shall not develop or promulgate any trade rule or regulation with regard to the regulation of the development and utilization of the standards and certification activities pursuant to this section. Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

---

71.   While the statute grants apparently broad power, the

17

Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. CONST. Art. I, § 1. Thus, "important subjects must be entirely regulated by the legislature itself," but an agency may fill in the details *when the legislature provides sufficient direction. See West Virginia*, 142 S.Ct. at 2617 (GORSUCH, J., concurring). The framers believed that the power to make laws regulating private conduct was a "grave" power that could threaten liberty. *See id.* That is one reason the framers "deliberately sought to make lawmaking difficult by insisting that two houses of Congress must agree to any new law and the President must concur or a legislative supermajority must override his veto." *Id.*

72.   Thus, courts should not permit Congress to "divest its legislative power" to an agency. *See id.* Otherwise, "[i]ntrusions on liberty would not be difficult and rare, but easy and profuse." *See id.* at 2618.

73.   "The Constitution … provides strict rules to ensure that Congress exercises [its] legislative power in a way that comports with the People's will." *Jarkesy v. SEC*, 34 F.4th 446, 459 (5th Cir. 2022). Consistent with the Supreme Court's directives in *West Virginia*, the Fifth Circuit in

18

*Jarkesy* cautions lower courts against blessing congressional grants of power that contravene the Constitution:

> [10] Indeed, President Woodrow Wilson, the original instigator of the agency that became the SEC, believed agencies like that one could solve the "problem" of congressional gridlock and the burden of popular accountability. *See Cochran v. SEC, 20 F.4th 194, 218 (5th Cir. 2021)* (Oldham, J., concurring) ("Wilson's 'new constitution' would ditch the Founders' tripartite system and their checks and balances for a 'more efficient separation of politics and administration, which w[ould] enable the bureaucracy to tend to the details of administering progress without being encumbered by the inefficiencies of politics.'" (quoting Ronald J. Pestritto, Woodrow Wilson and the Roots of Modern Liberalism 227 (2005))), *cert. granted sub nom., SEC v. Cochran, 21-1239, 2022 WL 1528373 (U.S. May 16, 2022); see also id.* ("Wilson's goal was to completely separate 'the province of constitutional law' from 'the province of administrative function.'" (quoting Philip Hamburger, Is Administrative Law Unlawful? 464 (2014)).

*Id.* at n. 10.

74.    The Fifth Circuit uses a two-part test to determine whether a congressional grant of power is constitutional: (1) whether Congress delegated power that would be legislative power but-for an intelligible principle to guide its use and, if it has, (2) whether Congress has provided an intelligible principle such that the agency does not exercise legislative power. *See id.* at 461.

75.    The FTC's promulgation of MITOR would be legislative power absent a guiding intelligible principle. *See id.* An action is "legislative" if

19

it has "the purpose and effect of altering the legal rights, duties and relations of persons … outside the legislative branch. *Id.* (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)). MITOR alters the legal rights of private businesses by imposing highly specific standards of conduct upon those private businesses. There is no serious argument to the contrary.

76.   Turning to the second question, Congress did not provide the FTC with an intelligible principle upon which it could have promulgated MITOR. Again, the FTC's sole authority to promulgate MITOR rests on 15 U.S.C. § 57a(a)(1)(B). That section only says the FTC may promulgate rules to define with specificity acts that are "unfair" or "deceptive." Congress gave the FTC no intelligible principles to guide its determination as to what is or is not "deceptive."

77.   With respect to many other trade regulation rules, on the other hand, Congress *did* provide intelligible principles. *See, e.g.,* 15 U.S.C. § 45c (deeming circumvention of event ticket access control measures illegal); § 45d (deeming certain acts or practices illegal with respect to substance abuse disorder treatment service and products); § 5711 (authorizing FTC promulgation of rules to regulate pay-per-call services); § 6102 (authorizing regulation of telemarketing industry); 42

U.S.C. § 6294 (energy labeling requirements). Indeed, the Code of Federal Regulations divides rules pursuant to "specific acts of congress" from generic "trade regulation rules." *Compare* 45 C.F.R. §§ 300-323 (specific acts of Congress) *with id.* at §§ 408-460 (generic trade regulation rules).

78.    By setting standards of conduct for all those who sell goods by mail, phone, and internet, MITOR affects a vast part of the United States economy. Under *West Virginia*, this outsized effect on the economy warrants application of the major questions doctrine. *See West Virginia*, 142 S.Ct. at 2608.

79.    In applying the doctrine, the Court may assume Congress would likely have delegated the power the FTC seeks to exercise here. *See id.* The question is thus not whether the policy is desirable or whether Congress would endorse the use of power – instead, the question is whether Congress *actually granted* the power. *Id.* at 2609.

80.    "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'" *Id.* Application of *West Virginia* requires that federal courts presume that "Congress intends to make major policy decisions itself, not leave those

21

decisions to agencies." *Id.* (quoting *United States Telecom Assn. v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (dissenting opinion)). For the FTC's actions here to be constitutional, the Commission must do more than point to a "merely plausible textual basis" for its authority. *See id.*

81.    The FTC will argue that it is a creature of Congress and not the Executive. The story of the FTC's genesis, however, does not mean that Congress may delegate its constitutional lawmaking duty to an independent agency like the FTC. The FCC is also an independent agency, and it may still not create binding rules without clear Congressional directives. *See, e.g., United States Telecom Assn.*, 855 F.3d at 419.

82.    Congress unconstitutionally abdicated (not just delegated) its legislative power to the FTC by allowing the Commission to define the meaning of "deceptive." Congress may not escape electoral accountability through such machinations, and the Court should deny the FTC's Motion.

### D.    Material fact questions exist as to whether Zaappaaz had a reasonable basis for its shipping claims.

83.    While hindsight is 20/20, nobody knew what was going to happen with the supply chain when the pandemic was in its infancy.

22

When China implemented export restrictions, Zaappaaz anticipated China would lift the restrictions quickly. DX 9 at 115:1-12. Instead, however, China lifted restrictions, reapplied them, and lifted them again. *Id.* at 116:9-14.

84.   Under the FTC's theory of the case, Zaappaaz should have instantly predicted the course of the pandemic. By the FTC's admission, however, Zaappaaz had zero customer complaints in January of 2020, ECF No. 100 ¶ 274, and in April had 820 complaints. *Id.* at ¶ 275. Zaappaaz' conduct must be viewed in light of what it knew and could know in April of 2020 – not what everyone now knows with perfect hindsight. What Zaappaaz knew is that its systems and procedures for shipping to consumers from Asia resulted in on-time deliveries.

85.   Among others, fact questions thus exist as to (a) whether Zaappaaz' eight years of experience with fulfilling domestic orders from Asia was sufficient to have a reasonable expectation that it could deliver orders when promised; and (b) whether the pandemic – a black swan event – and its effect on logistics should have put Zaappaaz on notice it could not reasonably expect to timely deliver orders (even though there was no frame of reference for Zaappaaz to know that).

### E.   Material fact questions exist as to whether Zaappaaz maintained documentary proof establishing its use of systems and procedures to assure timely shipment.

86.   The FTC is not entitled to any presumption that Zaappaaz lacked a reasonable basis for any expectation of shipment within a stated time. Contrary to the FTC's position, Zaappaaz does maintain documentary proof establishing its use of systems and procedures which assure the shipment of merchandise.

87.   When a customer ordered PPE, Zaappaaz' procedures and systems generated an electronic record with the promised delivery date. DX 2 at 484:22-25. That is documentary proof of systems and procedures. *Id.* Next, Zaappaaz had a tracking number generated and transferred into Zaappaaz' back-end software. *Id.* at 6-9. That is a record and documentary proof of systems and procedures. Zaappaaz' maintenance of these records constitutes documentary proof it had procedures and systems in place to assure timely shipment. *Id.* at 486:4-7. Thus, there is a material question of fact as to whether Zaappaaz maintains documentary proof it had procedures and systems in place to assure timely shipment. Nothing in the MITOR Rule requires *written* procedures.

24

88.     To disprove the existence of a fact question, the FTC relies on
three paragraphs from its SOF:

> 51.     On February 27, 2020, Mr. Makanojiya's payment processor Braintree's Risk Team emailed Mr. Makanojiya stating, "Your WB Promotion account was recently flagged due to a recent decrease in your processing volume.  We noticed today there was a large spike in refunds and a big drop off in sales."   Braintree asked for more details including financial information.  PX 50.
>
> 52.     On March 12, 2020 at 5:02 pm, Mr. Makanojiya replied saying, "Our production has slowed down and supply chain has been distrusted [sic] due to corona virus.  We are working with customer[s] in [sic] case by case basis to resolve all orders that are being delayed."  PX 50.
>
> 53.     At 5:28 pm that same day, Mr. Makanojiya also stated, "We have our vendors slowly coming back online but we are not full throttle yet.  But I'm sure things will get back to normal soon.  Currently we have limited the orders we are accepting."  PX 50.

ECF No. 100 ¶¶ 51-53.

89.     This is not conclusive evidence that "complaints began piling
up in February of 2020" or that "Defendants knew the pandemic had
already created supply chain interruptions for their traditional
products." But those are the two factual propositions for which Plaintiff
cites paragraphs 51-53. In fact, Paragraph 53 shows Mr. Makanojiya had
a reasonable expectation that "things [would] get back to normal soon."
The cited paragraphs create fact issues and do not prove the absence
thereof.

25

**F.      The FTC must prove individualized consumer harm to recover under Section 19.**

90.     As stated earlier, Defendants adopt by reference their Motion for Summary Judgment (ECF No. 101). That Motion explains why the FTC must prove individualized consumer harm to recover in this case. The FTC has not done so and cannot do so. As such, the Court must deny the FTC's Motion.

91.     In 2020, a majority of FTC Commissioners approved a non-monetary settlement against Sunday Riley. In that case, Riley created fraudulent consumer reviews to entice consumers to buy beauty products. DX 15. The activity was illegal, and in s majority statement joined by Commissioner Wilson, the Commissioners explained:

> Every case presents unique circumstances, and there are many factors that must be considered in determining what constitutes an appropriate settlement. The primary factor is the law. For example, to obtain monetary relief, the Commission must have a viable legal basis to demonstrate consumer injury or ill-gotten gains from the alleged violations. In some cases, such as frauds where the consumer receives no value, this calculation may be obvious. In others, including *Sunday Riley*, a legally defensible calculation of ill-gotten gains may be difficult. In such cases, the expenditure of resources needed to develop an adequate evidentiary basis reasonably to approximate ill-gotten gains may substantially outweigh any benefits to consumers and the market. We believe the Commission's order strikes the right balance.

92.     This is a case where consumers received something of value, just as in the Sunday Riley case. While the FTC conclusively states it could not verify $12 million worth of product, that is not the same thing

as saying $12 million worth of product was *actually* not delivered. The FTC's scheming – in trying to avoid the rigors of expert designation through sham fact witness designations, and in misconstruing the summary judgment evidence – should not be rewarded. The Court should deny the Motion.

## VII.  Conclusion

The FTC has a documented history of abusing the authority Congress granted it. It asks the Court to resolve complex legal and fact issues in summary fashion without a full trial. It misrepresents facts as "uncontested" where the facts are contested and misleads the Court about what the facts actually are. The administrative rule upon which the FTC relies was promulgated under an unconstitutional delegation of legislative power, and this Response illustrates fact issues that preclude summary judgment.

## VIII. Prayer

Defendants ask the Court to deny the FTC's Motion for Summary Judgment and for all other relief to which Defendants may show themselves justly entitled.

 Dated: December 27, 2022

27

Respectfully submitted,

FOR DEFENDANTS

*/s/ Michael J. Blanchard*
State Bar No 24036231

OF COUNSEL:

Butch Boyd Law Firm
Ernest W. Boyd (Lead Attorney) State
Bar No. 00783694
butchboyd@butchboydlawfirm.com
Michael J. Blanchard (Of Counsel)
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com
Jillian Scherrer
jillianscherrer@butchboydlawfirm.com
2905 Sackett Street
Houston, TX 77098
713-589-8477 (Phone)
713-589-8563 (Fax)

28

## <u>CERTIFICATE OF SERVICE</u>

I certify that that on December 27, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, served on users registered to receive electronic notice in the captioned case via transmission of Notices of Electronic Filing generated by CM/ECF, and via email on the counsel listed below.

Michelle Schaefer
600 Pennsylvania Avenue, NW,
CC-9528 Washington, DC 20580
(202) 326-3515; mschaefer@ftc.gov
(202) 326-2485; acollesano@ftc.gov

James E. Elliott,
Federal Trade Commission
Southwest Region 1999 Bryan
Street, Suite 2150
Dallas, Texas 75201
(214) 979-9373; jelliott@ftc.gov
(214) 979-9350 (main office)
(214) 953-3079 (fax)

*/s Michael J. Blanchard*
Michael J. Blanchard

29