# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>ZAAPPAAZ LLC, also d/b/a Wrist-Band.com, WBpromotion.com, CustomLanyard.net, and WB Promotions; and<br><br>AZIM MAKANOJIYA, individually and as an officer of ZAAPPAAZ LLC,<br><br>    Defendants. | Civil Action No. 4:20-cv-02717 |

## **DEFENDANTS' PROPOSED STATEMENT OF STIPULATED FACTS**

TO THE HONORABLE JUDGE OF SAID COURT:

    Defendants, Zaappaaz LLC and Azim Makanojiya, respectfully submit their Proposed Statement of Stipulated Facts. Defendants stipulate to the following facts:

    1.    Before the pandemic, Zaappaaz sold promotional items (wristbands, lanyards, and similar items) on its website.

    2.    Zaappaaz sourced 90% of its promotional items from Chandler Liu.

    3.    Zaappaaz relied on Mr. Liu to process Zaappaaz's pre-pandemic orders.

    4.    Ninety-nine percent of the time, Mr. Liu's China team would package and ship the promotional items.

    5.    Once Mr. Liu shipped, his software would send the tracking number back to Zaappaaz's custom built back-end system.

6.      Zaappaaz neither had nor has any insight into how Mr. Liu operated his business. Zaappaaz does not know, for example, what, if any, software Mr. Liu uses to handle the order fulfillment process.

7.      Mr. Liu had an oral contract with Zaappaaz to provide as much PPE as Zaappaaz needed. Once Zaappaaz noticed logistics problems, Zaappaaz changed its business model from overseas shipping to domestic shipping.

8.      Zaappaaz's principal had never heard of the Mail, Internet, and Telephone Order Rule ("MITOR") before the FTC filed this lawsuit.

9.      Zaappaaz guaranteed delivery dates for its products, not shipping dates.

10.     Zaappaaz began selling personal protective equipment ("PPE") in the middle of March 2020.

11.     Zaappaaz started selling PPE after the City of Houston reached out to Mr. Makanojiya and Mr. Makanojiya provided the city some masks.

12.     When Zaappaaz started selling PPE, it was able to timely fulfill orders directly from China. Zaappaaz had inventory in China.

13.     Zaappaaz had a reasonable basis to claim it had a supplier who had inventory and could ship immediately.

14.     Zaappaaz started shipping from Texas at the end of March or start of April 2020.

15.     Zaappaaz started shipping from Texas because: (a) shipper hubs became congested; (b) Chinese regulations changed overnight by, for example, halting PPE shipments to the U.S. and sending products back to the shippers; and (c) China disallowed shipping direct to consumer from China for small orders. In addition, shippers like FedEx implemented new rules overnight to reduce

allowed shipping weight from thousands of kilos to tens of kilos. FedEx also limited shipping to one package per day to a particular address.

16.     Zaappaaz tried to work around FedEx's new requirements by shipping to friends and family.

17.     To be clear, there were instances where FedEx would take custody of a package and then send the shipment back to the shipper to "restamp" the package.

18.     Once Zaappaaz started shipping from Texas, it ran 24-hour shifts at the warehouse.

19.     Zaappaaz could not, however, control shippers like FedEx.

20.     Zaappaaz could also not control customs blockages in China.

21.     Zaappaaz timely put PPE into the hands of shippers, but orders were still delayed for reasons beyond Zaappaaz's control.

22.     Zaappaaz had ample personnel to pack PPE and put orders into shippers' hands.

23.     Zaappaaz had a trailer outside its warehouse, and Zaappaaz would pack the trailer (thus placing product into FedEx's hands).

24.     Sometimes FedEx would fail to timely pick up the trailer.

25.     Zaappaaz never advertised a product as in stock that was not in stock.

26.     Zaappaaz described "packing" as placing a package into the hands of a shipper and "shipping" as the shipper leaving with the packaged product.

27.     The pandemic affected Zaappaaz's ability to deliver on time because of shipper delays, import/export limitations, and not because of Zaappaaz personnel problems or inventory problems. Likewise, shipper delays, and not Zaappaaz delays, impacted shipments from China.

28.     With respect to promotional items, the pandemic did not impact Zaappaaz's operations until March of 2020.

29. Zaappaaz placed a banner on its website notifying all customers that there were delivery delays caused by COVID-19.

30. Zaappaaz outsourced customer service responsibility to a group in India.

31. When Zaappaaz realized customer service representatives ("CSRs") relayed incorrect information to consumers, Mr. Makanojiya provided his personal cell phone number to disgruntled customers.

32. When a customer ordered PPE, Zaappaaz's procedures and systems generated an electronic record with the promised delivery date. That is documentary proof of systems and procedures.

33. Zaappaaz had a tracking number generated and transferred into Zaappaaz's back-end software. That is a record and documentary proof of systems and procedures.

34. Zaappaaz's maintenance of these records constitutes documentary proof it had procedures and systems in place to assure timely shipment.

35. Zaappaaz's policy was to issue a refund when a consumer called and asked for a refund because the product had not been delivered timely. This was also the instruction given to CSRs.

36. Zaappaaz instructed CSRs to initiate a refund to any customer that wanted a refund, and to any customer that received a product that the consumer did not want. If a product had left Zaappaaz's hands and a consumer wanted a refund, Zaappaaz's policy was to send the consumer a return label and process a refund on receipt of the returned goods.

37. Certain CSRs misrepresented Zaappaaz's policy due to lack of training by Zaappaaz's vendor.

38. Zaappaaz had a reasonable basis to make same-day shipping claims on PPE products, because (a) Zaappaaz knew the products were in stock in either its China or Texas warehouses and (b) it had experienced an eight-year history of shippers delivering Chinese products on time.

39. About three or four weeks after Zaappaaz started shipping from Texas, certain delivery restrictions were lifted and Zaappaaz was able to ship all products directly to its Texas warehouse.

40. When Zaappaaz saw that shipping PPE in volume was an issue, it chartered jets to fly product from China to the U.S.

41. Zaappaaz contracted with American personnel to handle customer service calls when customer service representatives ("CSRs") in India could not operate because of the pandemic.

42. Logistics is the process between the end of manufacturing and delivery to the customer.

43. Defendants' expert, Rosemary Coates, has 35 years of pervasive logistics experience. Her undergraduate degree is in business and logistics management.

44. In her 35-year career, Ms. Coates had never seen an event impact logistics the way COVID-19 did. The pandemic was a "black swan event" that might occur once in a lifetime.

45. Before the pandemic, 50% of worldwide freight moved on passenger aircraft. Once passenger flight frequency declined dramatically, the airplane belly cargo space was unavailable, imposing significant additional burdens on shipping companies.

46. FedEx was unable to timely deliver items timely put in FedEx's hands.

47. While there was plenty of PPE available in China, shippers had a difficult time making on-time deliveries.

48. FTC identifies only 1,396 orders with complaints out of over 95,000 orders.

49. FTC states it could not verify $12 million worth of product, this is not the same thing as saying $12 million worth of product was actually not delivered.

50. Mr. Jenkins' $12,241,035.69 calculation is not for products that are "undelivered" but for products that were "not known to have been delivered."

51. The reason why certain tracking numbers have missing delivery data is that it is common for Zaappaaz to generate shipping labels with tracking numbers that ultimately were not used, and another shipping label was created for that order.

52. There are instances where several tracking numbers are created for a single order, yet only one tracking number is ultimately used.

53. Mr. Makanojiya faced data importation issues when he created the spreadsheets FTC relies on for their damages calculations because the data was pulled from multiple sources and some information only FedEx had access to.

54. Personnel for Zaappaaz, Aftab Maredia, reviewed all orders in FTC's "comprehensive spreadsheet" that FTC considers "not known to have been delivered" and was not refunded.

55. Mr. Maredia looked up each of these orders in Zaappaaz's back-end database and confirmed that none of these orders had any customer complaints logged regarding lack of delivery.

56. When a customer of Zaappaaz places an order and either does not receive their order or has a complaint about their order, it is Zaappaaz's policy for the customer to email Zaappaaz customer service regarding their complaint.

57. When Zaappaaz's customer services representatives receive a complaint about an order from a customer, it is Zaappaaz's policy for their customer services representatives to log the complaint into the comment section of Zaappaaz's back-end database for a particular order.

58. If there are no comments in the back-end database or refund issued for a particular order, Zaappaaz believes that the order was shipped to the customer.

59. When a customer does not receive an order they placed with Zaappaaz, the customer typically either disputes the charge for the order with their bank or credit card company or sends a complaint to Zaappaaz customer service.

60. Banks and credit card companies provide customers with the functionality of disputing a charge if the customer does not receive their purchased order.

61. If a customer disputes a charge with Zaappaaz, this information would be located in Zaappaaz's back-end database or in the dispute section of the credit card statements.

62. Mr. Maredia confirmed using the information in Zaappaaz's back-end database that at least 307 of the orders FTC considers "not known to have been delivered" were, in fact, delivered to the customer. Therefore, at least 307 of the orders used in FTC's damages calculation for orders "not known to have been delivered" were delivered to the customer.

63. The FTC never designated Rufus Jenkins or Ann Miles as experts in this case.

64. Mr. Jenkins relied on outside sources beyond his personal knowledge developed from primary sources.

65. To determine the amount of economic injury, Mr. Jenkins relied on the work of another FTC employee, Ann Miles.

66. Mr. Jenkins relied on a spreadsheet Ms. Miles prepared that purported to show what products were delivered on time, late, and not at all.

67. Mr. Jenkins also relied on Ms. Miles' work in determining when orders were shipped and delivered.

68. Ms. Miles added her own work product to existing spreadsheets produced by the Defendants.

69. Ms. Miles added sheets or tabs to existing spreadsheets.

70. There is a distinction between net revenue and consumer injury.

71. Mr. Jenkins did nothing to determine if there was a distinction between net revenue and consumer injury in this case.

72. Mr. Jenkin's opinions were crafted based on instructions from FTC attorneys.

73. Ms. Miles manipulated the data Zaappaaz produced as ZAAPPAAZ_0020596 (PTX 57).

74. PTX 57 does not include any of the data referenced by Ms. Miles or Ms. Jenkins in their Declarations.

75. FTC failed to disclose their $12 million damages theory pursuant to Fed. R. Civ. P. 26(a).

Respectfully submitted,

*/s/ Butch Boyd*

Butch Boyd (Lead Attorney)
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
Jillian Scherrer
State Bar No. 24117793
jillianscherrer@butchboydlawfirm.com
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax: (713) 589-8563
Butch Boyd Law Firm

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I certify that on the 9th day of November, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, served on users registered to receive electronic notice in the captioned case via transmission of Notices of Electronic Filing generated by CM/ECF, and via email on the counsel listed below.

>Michelle Schaefer
>600 Pennsylvania Avenue, NW,
>CC-9528 Washington, DC 20580
>(202) 326-3515; mschaefer@ftc.gov
>(202) 326-2485; acollesano@ftc.gov
>
>James E. Elliott,
>Federal Trade Commission Southwest Region
>1999 Bryan Street, Suite 2150
>Dallas, Texas 75201
>(214) 979-9373; jelliott@ftc.gov
>(214) 979-9350 (main office)
>(214) 953-3079 (fax)

>*/s Butch Boyd*
>Butch Boyd