UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>ZAAPPAAZ LLC, also d/b/a Wrist-Band.com, WBpromotion.com, CustomLanyard.net, and WB Promotions; and<br><br>AZIM MAKANOJIYA, individually and as an officer of ZAAPPAAZ LLC,<br><br>    Defendants. | Civil Matter No. 4:20-cv-02717 |

**PLAINTIFF FTC'S MEMORANDUM REGARDING MONETARY REMEDIES[1]**

During the COVID-19 pandemic, Defendants Zaappaaz LLC and Azim Makanojiya took advantage of consumers' desperation by falsely claiming they had personal protective equipment ("PPE") in-stock and would rapidly ship it. In fact, they did not ship consumers' orders until much later than promised or, in many cases, not at all. ECF 117 at 1-3, 21-26, 29-35; ECF 126. The Court previously ruled at summary judgment both Defendants are liable for violating the FTC Act and the Mail, Internet, and Telephone Order Rule ("MITOR"). Defendants' violations injured two categories of consumers: (1) consumers who paid for PPE but received nothing; and

---

[1] The FTC submits this memorandum pursuant to the Court's invitation at the pretrial conference to brief issues regarding monetary remedies before 5 p.m. on Thursday, December 14, 2023.

1

(2) consumers who relied on Defendants' false promises about shipping times. Both types of injured consumers are entitled to full refunds, for different reasons.

### I. Full refunds are necessary for consumers who received nothing.

As the Court previously found, consumers paid Defendants $12,241,035.69 for PPE that Defendants never shipped. ECF 132 at 2. It is self-evident that full refunds are "necessary" to compensate consumers who paid for products they never received at all. 15 U.S.C. 57b(b) (authorizing relief "necessary to redress injury to consumers," including refund of money). Indeed, the Court recognized as much by noting at summary judgment that redressing "customers who never received any product" is one appropriate means of measuring the harm in this case. ECF 117 at 41; ECF 126.

Defendants have never contested the obvious proposition that they may not keep money they took from consumers who received nothing in return. Instead, Defendants continually seek to attack the Court's previous finding that such consumers made $12,241,035.69 in unrefunded payments. The Court made that finding based on uncontested evidence from both the Defendants' own records and the records of their shipping carriers (FedEx, UPS, USPS, and DHL) that the orders in question were never shipped. ECF 132 at 2; *see also* ECF 129 at 7-9, 131 at 6-9 (discussing the evidence upon which the finding is based). The Court has already rejected Defendants' arguments that such proof is somehow insufficient to demonstrate nondelivery, and Defendants' repetition of those arguments provides no reason to reconsider that ruling. *See* ECF 130 at 6-9 (Defendants' arguments); ECF 132 at 2 (ruling against Defendants). Therefore, the calculation of monetary relief must begin with the unrefunded amount consumers paid for products they never received: $12,241,035.69.

## II. Full refunds are necessary for consumers who made purchases in reliance on Defendants' misrepresentations.

The remainder of the injured consumers received their orders, but far later than Defendants promised. As the Court already found, Defendants promised their PPE was "in stock," "GUARANTEED TO SHIP TODAY," and "READY TO SHIP SAME DAY AND DELIVER IN 24 HOURS." ECF 129-1 at ¶¶15-16; ECF 132 at 2 (adopting ECF 129-1). In fact, Defendants did not have PPE in stock, and indeed "had no reasonable basis to claim that [their] PPE products would ship within 30 days, let alone same day." ECF 129-1 at ¶ 44; ECF 132 at 2 (adopting ECF 129-1). Furthermore, Defendants claimed they would refund unsatisfied consumers' payments, including payments for shipping costs, but did not do so. ECF 129-1 at ¶¶ 49, 57, 59, 60; ECF 132 at 2 (adopting ECF 129-1). In sum, Defendants lured in consumers who were desperate to quickly obtain scarce PPE at the onset of the global pandemic with false promises of a fast, risk-free transaction. As the Court previously found, these representations were material, because "[c]laims regarding when a customer will receive a product affect a consumers' decision to purchase that product," and because "representations regarding money-back guarantees" likewise influence purchasing decisions. ECF 117 at 31; ECF 126; ECF 129-1 at ¶¶ 60-63; ECF 132 at 2 (adopting ECF 129-1).

Every circuit to consider how to measure injury in cases of material pre-purchase misrepresentations recognizes that "injury to a consumer occurs at the instant of a seller's misrepresentations, which taint the consumer's subsequent purchasing decisions." *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014); *accord FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991); *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000). Thus, any

consumer who purchased Defendants' PPE in reliance on false shipping claims and did not receive the benefit of that bargain because they received neither the promised fast shipment nor the promised refund is entitled to compensation.

The Court must therefore consider (1) how to identify which consumers relied on Defendants' false claims and (2) how much money is due to such consumers. Longstanding, on-point, and persuasive case law answers both questions.

First, as the Court correctly held, the FTC established a rebuttable presumption[2] that each consumer who purchased late-shipped PPE relied on Defendants' shipping claims, because the FTC proved Defendants widely disseminated their material misrepresentations. ECF 117 at 37; ECF 126. Courts apply this presumption of reliance, and therefore harm, because "[r]equiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the [statutory] section." *Figgie*, 994 F.2d at 605-09; *see also Sec. Rare Coin*, 931 F.2d at 1316; *BlueHippo*, 762 F.3d at 243-4; *McGregor*, 206 F.3d at 1388. Furthermore, the Court found Defendants did not rebut this presumption at summary judgment, and Defendants' witness and exhibit lists and proposed findings of fact make plain they will not even seek to do so at trial. ECF 117 at 37; ECF 126; ECF 129-1 at ¶¶ 73-75; ECF 132 at 2 (adopting ECF 129-1); ECF 142 (Defendants' proposed

---

[2] All circuits that have considered this issue recognize the presumption in FTC cases, whether under Section 19 of the FTC Act, in contempt, or under Section 13(b) of the FTC Act. *See, e.g.*, *Figgie*, 994 F.2d at 606 (Section 19); *McGregor*, 206 F.3d 1378 (contempt); *FTC v. Kuykendall*, 371 F.3d 745, 765-66 (10th Cir. 2004) (contempt); *BlueHippo*, 762 F.3d at 243-46 (contempt); *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 603-05 (9th Cir. 2016) (Section 13(b)); *Sec. Rare Coin*, 931 F.2d at 1316 (Section 13(b)); *FTC v. Moses*, 913 F.3d 297, 310-11 (2d Cir. 2019) (Section 13(b)). In all instances, and in cases under other statutes designed to redress harm to large numbers of consumers, the rationale is the same: requiring the agency to prove harm as to each individual victim would thwart the statutory goals of providing redress to large classes of consumers. *E.g.*, *Figgie*, 994 F.2d at 605-09; *Sec. Rare Coin*, 931 F.2d at 1316; *BlueHippo*, 762 F.3d at 243-4; *McGregor*, 206 F.3d at 1388; *see also CFPB v. Gordon*, 819 F.3d 1179, 1196 (9th Cir. 2016) (applying presumption of reliance in CFPB case).

findings of fact); ECF 150 (Defendants' witness and exhibit list). Completely missing from Defendants' proposed evidence is any information related to a single Zaappaaz consumer who did not rely on their shipping misrepresentations.[3] ECF 150. Defendants therefore cannot meet their burden to prove "that *individual* transactions were atypical" because particular consumers who received late-shipped merchandise purportedly did not rely on shipping claims and were satisfied with late shipments. *Bronson Partners,* 654 F.3d at 369 (emphasis original). Thus, it is "necessary" to redress each consumer who purchased late-shipped, unrefunded PPE, because each such consumer relied on Defendants' lies and was injured as a result. 15 U.S.C. 57b(b); *see also* ECF 129-1 at ¶ 75 (because FTC established the presumption that each consumer relied on misrepresentations and Defendants have not rebutted it, "injury has been established"); ECF 132 at 2 (adopting ECF 129-1).

Second, the Court must determine the amount of money necessary to redress each such injured consumer. Full refunds are "necessary to redress injury to consumers," 15 U.S.C. 57b(b), where – as here – the injury in question is reliance on a pre-purchase, material misrepresentation that tainted the consumer's purchasing decision and thus robbed the consumer of the chance to avoid the purchase entirely. *Figgie*, 994 F.2d at 606-07 (awarding full refunds); *FTC v. QYK Brands LLC*, 2022 WL 1090257, at *7-9 (C.D. Cal. Apr. 6, 2022) (awarding full refunds (*i.e.*, net revenue) for late-shipped goods under Rule 19 for MITOR violations); *FTC v. Am. Screening*, 2022 WL 2752750, at *10-12 (E.D. Mo. July 14, 2022) (same); *FTC v. Romero*,

---

[3] Defendants do, however, propose to present evidence of numerous consumers who complained about their late shipments. ECF 150 (listing PTX56, Declaration of Adam Rottner, which summarizes consumer complaints). While this evidence clearly demonstrates that the complaining consumers relied on Defendants' misrepresentations and thus were dissatisfied with late shipments, it cannot prove the inverse – that all the other consumers who received late-shipped goods were satisfied – because "[f]ailing to complain is not the equivalent to satisfaction." *FTC v. On Point Global, LLC*, Verdict and Order, 2021 WL 6497592 (S.D. Fla. Nov. 15, 2021).

658 F. Supp. 3d 1129, 1141 (M.D. Fla. 2023) (same). The only way to redress such an injury is through a full refund, even if the product the consumer received had some value (*i.e.*, even if the PPE the consumer received late was still useful). "In other words, customers are not owed a refund because they received [products] that may or may not have been useful to them after Defendants' shipping delays; customers are owed a refund because Defendants' deception induced the sale in the first place." *QYK Brands*, 2022 WL 1090257, at *9; *see also Figgie*, 994 F.2d at 606-07 (denying offset for value of heat detectors because defendants promised fire detectors); *Kuykendall*, 371 F.3d at 766 (denying offset for value of magazines consumers were deceived into purchasing); *McGregor*, 206 F.3d at 1388-89 (denying offset for value of toner consumers were deceived into purchasing); *FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006, 1019 (C.D. Cal. 2012) (denying offset for money some consumers earned because defendants promised much higher returns); *FTC v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 386 (D. Conn. 2009) (denying offset for any "intrinsic value" of weight loss drink that failed to provide promised weight loss).

Indeed, every court to calculate remedies under MITOR and Section 19 for consumers who relied on pre-purchase misrepresentations about shipping times has granted full refunds for late-shipped goods, calculated by establishing net revenues (amounts paid minus amounts refunded). *See, e.g.*, *QYK Brands LLC*, 2022 WL 1090257, at *7-9; *Am. Screening*, 2022 WL

2752750, at *10-12;[4] *Romero*, 658 F. Supp. 3d at 1141. Defendants' claimed authority, *FTC v. Noland*, does not contradict this universal holding because the *Noland* court confronted a very different situation. In that case, the court explained, "the Merchandise Rule violations at issue … were not deceptive, pre-purchase misrepresentations," and thus did not "induce the sale in the first place." *FTC v. Noland*, 2023 WL 3372517, at *54 (D. Ariz. May 11, 2023).[5] Accordingly, full refunds were not "necessary" to redress defendants' MITOR violations in *Noland* because those violations did not taint the consumers' purchasing decisions. *Id*. The Noland court explicitly recognized this important distinction, explaining that it reached a different result than the *QYK* case, which had essentially the same facts as those presented here, because, in *QYK*, the "violations of the Merchandise Rule were not limited to shipping delays but also included pre-purchase misrepresentations about whether the products were in stock and would be shipped quickly." *Id*.

---

[4] In *QYK Brands* and *American Screening*, the courts granted full refunds for late-shipped merchandise to any consumers who requested them during a court-ordered and FTC-administered claims process, rather than to all such consumers, to account for consumers who "may have been satisfied" with delayed orders. *QYK*, 2022 WL 1090257, at *9; *Am. Screening*, 2022 WL 2752750, at *12; *see also Figgie*, 994 F.2d at 606 (employing claims process to identify consumers who desired refunds). First, the law does not require such a process, instead authorizing full refunds to all consumers whose purchasing decisions were tainted. *E.g., Romero*, 658 F. Supp. 3d at 1141 (awarding full refunds to consumers who received late-shipped products without claims process); *FTC v. Pub. Bus. Servs., Inc*., 2017 WL 451953, at *4 (D. Nev. Feb. 1, 2017) (denying offsets for satisfied customers because "The fact that some customers were ultimately satisfied … does not necessarily mean their original decision to purchase was free from the taint of the defendants' deceptive sales practices."), *rev'd on other grounds*, 849 Fed. App'x 700 (2021). Second, requiring **consumers** to prove they were dissatisfied by requesting a refund is contrary to the law; as discussed above, once the FTC establishes a presumption of reliance, the burden shifts to **Defendants** to prove that particular consumers should not be redressed because they did not rely on the misrepresentations and thus were satisfied with their purchases. *Kuykendall*, 371 F.3d at 766. Finally, even if the Court did direct the FTC to institute a claims process for late-shipped orders to address its concerns about windfalls in this case, consumers who never received their orders should simply receive full refunds with no need to make a claim, as such consumers would get no "windfall" from a refund.

[5] Specifically, that matter involved the "sale" of the right to participate in a pyramid scheme. Defendants' false earnings claims, therefore, induced consumers to purchase, not the post-sale and technically violative delivery claims. The product at issue was little more than a fig leaf to cover the scheme, and thus, essentially immaterial to consumers' decisions to purchase. *See FTC v. Noland*, 2021 WL 4127292, at *20-26 (D. Ariz. Sept. 9, 2021); *FTC v. Noland*, 2021 WL 5493443, at *7 (D. Ariz. Nov. 23, 2021); *FTC v. Noland*, 2023 WL 3372517, at *54-55 (D. Ariz. May 11, 2023).

7

Finally, the Court already found the amount necessary to provide full refunds to consumers who relied on Defendant's misrepresentations and then received late-shipped merchandise. The Court found Defendants' total net revenues (*i.e.*, amounts consumers paid minus amounts refunded) from undelivered PPE orders plus those delivered late were $37,549,472.14, and as discussed above, total net revenues from undelivered shipments alone were $12,241,035.69. ECF 132 at 2. Thus, the amount necessary to refund just consumers who received late-shipped orders is the delta between the two: $25,308,436.45.

The FTC therefore is legally entitled to an award total relief in the amount of $37,549,472.14. As discussed above, this is the total Defendants owe two groups of consumers: refunds owed to consumers because they paid for products they never received ($12,241,035.69), and refunds owed to consumers because they relied on Defendants' false shipping and refund promises but instead received late-shipped goods ($25,308,436.45).

                                                                                       Respectfully Submitted,

Dated: December 14, 2023            */s Michelle Schaefer*
                                                  Michelle Schaefer, Attorney-in-Charge
                                                  D.C. Bar # 478443
                                                 S.D. Texas (admitted *Pro Hac Vice*)
                                                 Anne Collesano
                                                 D.C. Bar # 1029665
                                                 S.D. Texas (admitted *Pro Hac Vice*)
                                                 600 Pennsylvania Avenue, NW, CC-9528
                                                 Washington, DC 20580
                                                 (202) 326-3515; mschaefer@ftc.gov
                                                 (202) 326-2485; acollesano@ftc.gov

                                                 Attorneys for Plaintiff
                                                 FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I certify that on December 14, 2023, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF and served on users registered to receive electronic notice in the captioned cases via transmission of Notices of Electronic Filing generated by CM/ECF including:

**Butch Boyd Law Firm**

Ernest W. Boyd (Lead Attorney)
State Bar No. 00783694
butchboyd@butchboydlawfirm.com

Michael J. Blanchard (Of Counsel)
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com

Jillian Scherrer
State Bar No. 24117793
jillianscherrer@butchboydlawfirm.com

2905 Sackett Street
Houston, TX 77098
713-589-8477 (Phone)
713-589-8563 (Fax)
Attorneys for Defendants

Dated:   December 14, 2023           /s Michelle Schaefer
                                     Michelle Schaefer, Attorney-in-Charge